DETROIT/WAYNE COUNTY STADIUM AUTHORITY v
DRINKWATER, TAYLOR AND MERRILL, INC
DETROIT/WAYNE COUNTY STADIUM AUTHORITY v TOOVALIAN
DETROIT/WAYNE COUNTY STADIUM AUTHORITY v
BIMINI PROPERTIES, INC
DETROIT/WAYNE COUNTY STADIUM AUTHORITY v ROJO FARMS
DETROIT/WAYNE COUNTY STADIUM AUTHORITY v WINGATE

Docket Nos. 251799, 251800, 251801, 251802, 251869, 251870. Submitted June 14, 2005, at Detroit. Decided August 9, 2005, at 9:00 a.m. Leave to appeal sought.

The Detroit/Wayne County Stadium Authority brought separate condemnation actions in the Wayne Circuit Court against Drinkwater, Taylor and Merrill, Inc.; Mary Toovalian and others; Bimini Properties, Inc., and others; Rojo Farms; and James Wingate, Sr., and others. The actions all related to the acquisition of property for use in constructing new stadiums for the Detroit Lions and the Detroit Tigers. The defendants had rejected the stadium authority's good-faith offers and sought additional compensation, contending that in the absence of the project, the highest and best use of their properties was for assemblage with other properties for casino development. Cynthia Diane Stephens, J., presided over separate jury trials in which the sole issue was just compensation. In the proceedings involving Drinkwater, Toovalian, and Bimini, the juries returned verdicts equal to the stadium authority's offers. Those defendants appealed those verdicts, and the stadium authority cross-appealed, in Docket Nos. 251799, 251800, 251801, and 251802. In the proceedings involving Rojo Farms and Wingate, the juries returned verdicts that exceeded the stadium authority's offers. The stadium authority appealed those verdicts, and those defendants cross-appealed, in Docket Nos. 251869 and 251870. The Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

1. The trial court did not err by directing the juries to consider whether private assemblage of the properties for casino development was "reasonably probable" within a reasonable time and for a reasonable price, rather than instructing the juries to consider whether it was "reasonably possible." An award of just compensation in a condemnation proceeding is based on the fair market

value of the property as of the date of the taking. To determine fair market value, the highest and best use of the property must also be determined. For this purpose, the courts have permitted consideration of assemblage, which is the use of a parcel of property in conjunction with other properties. A jury may consider a prospective use of condemned property that involves the private assemblage of the property with other privately owned parcels if the likelihood of that use is sufficiently great to affect the fair market value, that is, if it is reasonably probable.

2. The trial court did not err by denying the stadium authority's motions for judgment notwithstanding the verdicts. In each case, it was for the jury to weigh the testimony of the witnesses, including that concerning casino development, in determining the highest and best use of the property and its fair market value. Nor did the trial court abuse its discretion by denying the stadium authority's motions for new trials premised on this same issue.

3. The trial court did not abuse its discretion by allowing the defendants' appraiser to testify about comparable sales made after the dates of the takings. Generally, a condemnation award is based on the fair market value at the time of the taking. Evidence regarding value, however, should be liberally received. It is within the trial court's sound discretion to permit evidence concerning comparable sales that took place within a reasonable time of the takings in determining fair market value, in these cases sales occurring one to four months after the takings. The trial court also properly allowed posttaking evidence for impeachment.

4. The trial court properly admitted a memorandum under MRE 803(24). The circumstances surrounding the preparation and subsequent circulation of the memorandum indicate that it was sufficiently trustworthy, tended to establish what was discussed at the meeting it memorialized, and was the most probative documentary evidence of what was discussed at that meeting. Thus, the general purpose of the hearsay rule and the interests of justice were best served by admitting the memorandum.

5. The trial court did not abuse its discretion by allowing the defendants to introduce evidence that two of the stadium authority's witnesses were previously affiliated with the law firm representing the stadium authority. A witness's credibility is a primary question for the jury to evaluate, and questions on cross-examination eliciting bias, prejudice, or interest are appropriately allowed within the trial court's discretion.

6. The trial court's instructions did not suggest that the order of presenting proofs was connected to the burden of proof in the cases.

7. The stadium authority is not entitled to a new trial on the basis of juror bias or misconduct. While one juror sent a note to the trial court indicating personal knowledge of an offer to purchase a property not involved in the case for which the juror sat, there is no indication that the juror failed to disclose information asked of her during voir dire. There is also no indication that the juror was biased or shared information with the other jurors.

8. The trial court erred by allowing the introduction of evidence concerning damages related to lost profits in support of a claim for business interruption damages. Damages resulting from business interruption are compensable in condemnation cases, but damages related to lost profits are not recoverable. The bulk of the testimony regarding business interruption damages in Docket No. 251870 related to increased labor and operation costs that are a result of the businesses being forced to relocate. These clearly are damages that relate to lost profits and not business interruption damages.

Docket Nos. 251799, 251800, 251801, 251802, and 251869 affirmed. Docket No. 251870 affirmed in part, reversed in part, and remanded for retrial regarding business interruption damages.

1. EMINENT DOMAIN — JUST COMPENSATION — FAIR MARKET VALUE — HIGHEST AND BEST USE — ASSEMBLAGE OF PROPERTIES.

Consideration of assemblage, which is the use of a parcel of property in conjunction with other properties, is permitted in determining the highest and best use of the property when awarding just compensation for condemnation; a jury may consider a prospective use of the property that involves private assemblage if the likelihood of that use is sufficiently great to affect the fair market value, that is, if it is reasonably probable.

2. EMINENT DOMAIN — JUST COMPENSATION — FAIR MARKET VALUE — POSTTAKING COMPARABLE SALES.

A condemnation award is generally based on the fair market value of the property at the time of taking; evidence regarding value should be liberally received, and it is within the trial court's sound discretion to permit evidence concerning comparable sales that took place within a reasonable time of the taking in determining fair market value.

3. WITNESSES — CREDIBILITY — EVIDENCE OF BIAS, PREJUDICE, OR INTEREST.

    A witness's credibility is a primary question for the jury to evaluate, and questions on cross-examination eliciting bias, prejudice, or interest are appropriately allowed within the trial court's discretion.

4. DAMAGES — EMINENT DOMAIN — BUSINESS INTERRUPTION — LOST PROFITS.

    Damages resulting from business interruptions are compensable in condemnation cases, but damages related to lost profits are not recoverable; damages related to increased labor and operation costs as a result of being forced to relocate a business are damages that relate to lost profits and not business interruption damages.

*Dickinson Wright PLLC* (by *John E. S. Scott, Peter H. Webster, Paul R. Bernard,* and *Barbara H. Erard*) for the plaintiff.

*Plunkett & Cooney, P.C.* (by *Mary Massaron Ross* and *Christine D. Oldani*), and *Ackerman & Ackerman, PC* (by *Alan T. Ackerman* and *Darius W. Dynkowski*), for the defendants.

Before: BANDSTRA, P.J., and FITZGERALD and METER, JJ.

FITZGERALD, J. These consolidated appeals arise out of condemnation proceedings initiated by the Detroit/Wayne County Stadium Authority (the stadium authority) to acquire various parcels of property for use in constructing new stadiums for the Detroit Lions and the Detroit Tigers. The stadium authority acquired several parcels without the need for condemnation. The present cases involve properties for which condemnation actions were necessary because the property owners refused the stadium authority's good-faith offers.[1] Defendants did not contest the necessity of the takings

---

    [1] MCL 213.55(1) requires a condemning agency, before initiating negotiations for the purchase of property, to make a "good faith written offer" based on the agency's appraisal of just compensation for the property.

and, therefore, the trial court entered orders vesting title in and granting possession of the parcels to the stadium authority. The stadium authority was ordered in each case to pay defendants the amount of the good-faith offer. Defendants pursued additional compensation in court, contending that, in the absence of the dual-stadiums project, the "highest and best use"[2] of their properties was for assemblage with other properties for casino development, rather than for commercial development as contended by the stadium authority. A jury trial was held in each case, with the sole issue being the amount of just compensation owed for property taken pursuant to the power of eminent domain.

In Docket No. 251799, the stadium authority had offered $150,000 for the property, a 7,500-square-foot parcel of land[3] with 75 feet of frontage on Adams and 100 feet of frontage on Witherell. The property was paved and contained a small Coney Island restaurant. The property was also periodically used as an overflow parking lot in connection with events at local theaters. The jury returned a verdict of $150,000.

In Docket No. 251800, the stadium authority had offered $20,000 for the property, a 1,892-square-foot vacant lot with 25 feet of frontage on Elizabeth Street. The jury returned a verdict of $20,000.

In Docket Nos. 251801 and 251802, the stadium authority had offered $170,000 for the property known as parcel 152, an 11,159-square-foot parcel of land with 71 feet of frontage on the east service drive for the

---

[2] " 'Highest and best use' is a concept fundamental to the determination of true cash value. It recognizes that the use to which a prospective buyer would put the property will influence the price which the buyer would be willing to pay." *Edward Rose Bldg Co v Independence Twp,* 436 Mich 620, 633; 462 NW2d 325 (1990).

[3] An acre of land is 43,560 square feet.

Fisher Freeway. The property contained an abandoned home and an abandoned three-story industrial building. The stadium authority had offered $107,000 for the property known as parcel 151, a 10,700-square-foot vacant lot with 80 feet of frontage on the east service drive for the Fisher Freeway. The jury returned a verdict of $170,000 for parcel 152 and $107,00 for parcel 151.

In Docket No. 251869, the stadium authority had offered $32,000 for the property, a 25-foot by 80-foot strip of land containing 2,000 square feet. The jury returned a verdict of $194,720.

In Docket No. 251870, the stadium authority had offered $156,000 for the property, a 15,600-square-foot parcel of land that was used as a parking and maintenance lot for taxi and transportation service businesses. The jury returned a verdict of $1,427,181, consisting of $1,248,000 for the land and $179,181 as compensation for the interruption of business during relocation from the property.

## FACTS[4]

In 1993 former Detroit Mayor Coleman Young supported legislation known as "Speeda Legislation" that would provide funds to construct a new stadium for the Detroit Tigers. Young's mayoral successor, Dennis Archer, also supported the legislation. The stadium was proposed for the east side of Woodward Avenue across the street from the Fox Theater. Shortly after a March 1996 citywide vote was held to determine if the city would be able to use public or city funds to help finance a new stadium, the Detroit Lions expressed an interest

---

[4] Because these appeals involve five separate lengthy trials, specific facts will be discussed where relevant to the issues raised on appeal.

in relocating to the city of Detroit and constructing a new stadium. On August 10, 1996, a joint press conference was held to announce that the Detroit Tigers and the Detroit Lions had agreed to construct dual stadiums on the east side of Woodward Avenue, in an area known as "Foxtown," where defendants' properties are located. Defendants' properties were taken pursuant to the power of eminent domain for the purpose of constructing the dual stadiums.

In each case, defendants rejected the stadium authority's good-faith offers and sought just compensation on the theory that, in the absence of the dual-stadiums project, their properties would have been combined with many other parcels of property and used in connection with casino development. The stadium authority introduced evidence that, at the time of the condemnation of defendants' properties, the highest and best use of the properties was for commercial development. It introduced evidence that government policy made it impossible for any casino to locate in the area of defendants' properties and that no casino developer had an interest in developing a casino in Foxtown after the Governor indicated in June 1995 that he would not approve off-reservation Indian gaming in the city of Detroit. Defendants introduced evidence that, in the absence of the dual-stadiums project, their properties would have been used in connection with casino development, and presented evidence in support of their theory of valuation.

DOCKET NOS. 251799, 251800, 251801, 251802

Defendants argue that the trial court erred by providing a jury instruction premised on the *probability* of assemblage for casino development rather than the *possibility* of assemblage for casino development.

Claims of instructional error are generally reviewed de novo. *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 8; 651 NW2d 356 (2002). A determination based on a legal issue is a question of law subject to review de novo. *Jackson v Nelson*, 252 Mich App 643, 647; 654 NW2d 604 (2002). Reversal is not required unless the failure to reverse would be inconsistent with substantial justice. MCR 2.613(A); *Ward v Consolidated Rail Corp*, 472 Mich 77, 84, 87; 693 NW2d 366 (2005). There is no error requiring reversal if, on balance, the theories of the parties and the applicable law were adequately and fairly presented to the jury. *Murdock v Higgins*, 454 Mich 46, 60; 559 NW2d 639 (1997); *In re Flury Estate*, 249 Mich App 222, 225-226; 641 NW2d 863 (2002).

Defendants argue that the trial court erred in instructing the juries about how to evaluate prospective uses of their properties, specifically the prospective use for casino development. Defendants argue that the instruction that directed the juries to consider whether "a prudent buyer would have had a belief that private assemblage was reasonably probable within a reasonable time and for a reasonable price" was erroneous because the jury should have been instructed to consider whether it was "reasonably possible"—not "reasonably probable"—that a private assemblage for casino development would occur.

In the condemnation setting, "just compensation" is defined as the amount of money that will put the person whose property has been taken in as good a position as the person would have been in had the taking not occurred. *Dep't of Transportation v VanElslander*, 460 Mich 127, 129; 594 NW2d 841 (1999); *In re Acquisition of Land for the Central Industrial Park Project*, 142 Mich App 675, 676-677; 370 NW2d 323 (1985); SJI2d

90.05, now M Civ JI 90.05. An award of just compensation is based on the fair market value of the property. Fair market value is to be determined as of the date of the taking. See *Silver Creek Drain Dist v Extrusions Div, Inc,* 468 Mich 367, 378-379; 663 NW2d 436 (2003). "Fair market value" is

> "the highest price estimated in terms of money that the land will bring if exposed for sale in the open market with a reasonable time allowed to find a purchaser buying with knowledge of all the uses and purposes to which it is adapted and for which it is capable of bring used; the amount which land would bring if it were offered for sale by one who desired, but was not obliged, to sell, and was bought by one who was willing, but not obliged to buy; what the land would bring in the hands of a prudent seller, at liberty to fix the time and conditions of sale; what the property will sell for on negotiations resulting in sale between an owner willing but not obliged to sell and a willing buyer not obliged to buy; what the land would be reasonably worth on the market for a cash price, allowing a reasonable time within which to effect a sale." [*Consumers Power Co v Allegan State Bank,* 20 Mich App 720, 744-745; 174 NW2d 578 (1969) (*Consumers Power I*) (citation omitted). See also SJI2d 90.06, now M Civ JI 90.06.]

In determining fair market value, one must also determine the highest and best use of the property. *St Clair Shores v Conley,* 350 Mich 458, 462; 86 NW2d 271 (1957); *In re Condemnation of Lands in Battle Creek for Park Purposes,* 341 Mich 412, 419-420; 67 NW2d 49 (1954). "Highest and best use" means "the most profitable and advantageous use the owner may make of the property even if the property is presently used for a different purpose or is vacant, so long as there is a market demand for such use." SJI 2d 90.09, now M Civ JI 90.09; see also *Jack Loeks Theatres, Inc v City of*

*Kentwood,* 189 Mich App 603, 618-619; 474 NW2d 140 (1991), vacated in part 439 Mich 968 (1992).[5]

In determining the highest and best use of the property, Michigan courts have permitted consideration of the assemblage doctrine. *Consumers Power I, supra* at 737-738. Assemblage involves the use of a parcel of property in conjunction with other properties.

In support of their argument, defendants rely on a series of cases involving rezoning, variances, and special use permits. The stadium authority concedes that Michigan law, including the civil jury instructions, makes it clear that the "reasonably possible" standard applies to the prospect of rezoning,[6] but asserts that there is no authority to establish that it applies to the prospect of private assemblage. It argues that Michigan case law addressing jury instructions regarding the prospect of assemblage is consistent with the instructions given in these cases and that the instructions are consistent with Michigan condemnation law for determining just compensation.

Both the stadium authority and defendants agree that *Consumers Power I* is the leading authority regarding how a jury should be instructed to evaluate a prospective use of condemned property that involves the private assemblage of the property with other privately owned parcels. In *Consumers Power I,* a public utility sought to create a gas storage facility from an underground cavern that had originally held natural gas but had been emptied. The utility sought to use eminent domain to condemn the numerous parcels of property that contained the cavern. In one of the cases

---

[5] In modifying the case, the Supreme Court vacated the award of attorney fees.

[6] See *Dep't of Transportation v Haggerty Corridor Partners Ltd Partnership,* 473 Mich 124, 136-138; 700 NW2d 380 (2005).

arising from these condemnations, the property owners sought to have the fact-finder value the property as though it could have been used as a gas storage facility, even though it was not being so used at the time of taking. The question arose in the trial court whether and how the jury should be instructed to account for the prospect of assembling the subject property with other parcels for the purpose of using all the properties as a gas storage facility. *Consumers Power I, supra* at 735-737.

In considering this question, this Court stated:

> "Even though the increased market value is due to the adaptability of the property for valuable uses in conjunction with other properties, it may be considered, if the practicality of the combination of all necessary properties on which such availability depends is at the time of the condemnation so great as *probably to affect the public mind,* and therefore increase the price which a purchaser might be expected to give. This rule is not, however, applied where the chance of different parcels of land being brought together by agreement or purchase, in such a way as to be available for the use, is to be regarded as too remote and speculative to have any legitimate effect upon the valuation." [*Id.* at 737-738 (emphasis added; citation omitted).]

This Court expressly employed the concept of "probability" rather than "possibility" to describe the degree of likelihood that was necessary to support a finding that the subject property's fair market value would be affected by the prospect of a use for which assemblage was required.[7]

---

[7] A majority of the Supreme Court affirmed this Court's decision in *Consumers Power I* without any material comment on or alteration of this Court's ruling on how the jury should have been instructed. *Consumers Power Co v Allegan State Bank,* 388 Mich 568, 574; 202 NW2d 295 (1972) (*Consumers Power II*). Accordingly, this Court's statement of the law regarding jury instructions on assemblage is authoritative.

Defendants contend that the Supreme Court in *Consumers Power II* used the concepts of "reasonable probability" and "reasonable possibility" interchangeably. This contention is misplaced, as the use of those concepts occurred in an opinion partially concurring, not in the majority opinion. Rather, the majority opinion simply affirmed this Court's holding without any discussion of the concepts of "reasonably probable" or "reasonably possible."

Defendants also contend that this Court in *Consumers Power I* recognized the distinction between the "reasonably probable" standard and the "reasonably possible" standard. Defendants purport to find this distinction in this Court's opinion through this Court's reliance on *City of Allegan v Vonasek*, 259 Mich 310; 243 NW 14 (1932) (*Vonasek I*), and *City of Allegan v Vonasek*, 261 Mich 16; 245 NW 557 (1932) (*Vonasek II*). Although this Court's opinion in *Consumers Power I* does cite the *Vonasek II* case, it does not directly rely on it. This Court distinguished its holding from *Vonasek II* by asserting that "[o]ur case can be better likened to *Emmons* v. *Utilities Power Company* (1927) 83 NH 181 (141 A 65), as reported in 58 ALR 788." *Consumers Power I, supra* at 740. This Court relied directly on the *Emmons* opinion to assert that a jury should consider the prospect of assemblage only when it was so likely that it would *probably* affect market value. *Id.* (" 'if the practicability of the combination of all the necessary properties on which such availability depends was at the time of condemnation so great as probably to affect the public mind' ").[8]

---

[8] In *Emmons*, the court stated that "the plaintiff's undeveloped water power here may be considered in its relation to the whole of any mooted combination, but only to the extent that the probability of such a union

Additionally, the *Vonasek* cases do not support defendants' contention that the "reasonably possible" standard should apply in assemblage cases. In *Vonasek I*, the Supreme Court held that the jury should be instructed to account for prospective uses only to the extent that such uses "may be reasonably expected in the immediate future." *Vonasek I, supra* at 316. The Court did not hold that where a prospective use depended on a private assemblage, a jury should be instructed to account for that use whenever there is a "reasonable possibility" that the assemblage could be accomplished. Rather, the Court held that the jury should account for the prospects of assemblage only when the fulfillment of those prospects was sufficiently likely that a reasonable person would expect it to happen in the immediate future.

A jury may consider a prospective use that would come from private assemblage if the likelihood of such use is sufficiently great to affect fair market value:

> Thus, where the adaptability for a specific use depends upon the land's being used in combination with lands belonging to other persons, such use may be shown if the possibility of such combinations is so great as to have a definite effect in enhancing the market value of the property. [4 Nichols, Eminent Domain (3d ed), § 12B.12, p 12B-115.]

Although this passage does not include the term "probable," the passage also does not assert that a jury may consider any "reasonably possible" use. Rather, it provides that a jury may only consider those uses that are "*so great* as to have a *definite* effect" on market value. This language suggests a standard more akin to "probability" than "possibility."

would have affected the mind of a prospective purchaser of the plaintiff's power in its unimproved state at the time it was taken." *Emmons, supra* at 188.

Also, with regard to prospective uses:

> The possibility of its use for all purposes, present and prospective, for which it is adapted and to which it might in reason be applied, must be considered. Its value for the use to which men of prudence and wisdom and having adequate means would devote to the property if owned by them must be taken as the ultimate test. On the other hand, possible uses which are so remote and speculative and which would require the concurrence of so many extrinsic conditions and happenings as to have no perceptible effect upon present market value must be excluded from consideration. [4 Nichols, Eminent Domain (3d ed), § 12B.12, pp 12B-89 to 12B-101.]

According to this passage, uses that are too remote and speculative and that depend on the concurrence of numerous contingencies must not be considered. The United States Supreme Court has stated:

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth. [*Olson v United States*, 292 US 246, 257; 54 S Ct 704; 78 L Ed 1236 (1934).]

And, in *Jack Loeks Theatres, supra* at 618-619, this Court, in determining the admission of testimony regarding value, quoted the general principle about the evaluation of prospective uses for condemned property that is set forth in 4 Nichols, Eminent Domain (3d ed), § 12B.12 p 12B-104:

> "To warrant admission of testimony as to the value for purposes other than that to which the land is being put, . . . the landowner must first show: (1) that the property is adaptable to the other use, (2) that it is *reasonably probable*

that it will be put to the other use within the immediate future, or within a reasonable time, and (3) that the market value of the land has been enhanced by the other use for which it is adaptable." [Emphasis added.]

In light of this authority, the trial court's instruction directing the juries to consider whether "a prudent buyer would have had a belief that private assemblage was reasonably probable within a reasonable time and for a reasonable price" was not erroneous.

Defendants' reliance on cases dealing with rezoning to support the proposition that all cases involving prospective uses of condemned property require the use of the "reasonably possible" standard is misplaced. The Michigan Model Civil Jury Instructions provide a specific instruction governing rezoning that establishes a particular standard for cases in which the possibility of rezoning affects the likelihood of a prospective use. See M Civ JI 90.10; see also SJI2d 90.10. A similar instruction for other kinds of prospective uses does not exist, demonstrating that rezoning cases are unique in themselves. Indeed, rezoning relates only to the single contingency of whether the government agency will authorize rezoning, whereas assemblage relates to a chain of contingencies (whether several different landowners will sell to a single buyer in several independent transactions for a particular use and for a reasonable price within a reasonable period of time). The contingencies involved in any private assemblage make the proof of a private assemblage materially different from the proof of rezoning.

Defendants also argue that the trial court improperly allowed testimony that the city of Detroit would exercise the power of eminent domain to obtain the properties necessary to assemble land for casino sites if voluntary purchases were not made because eminent

domain is not a lawful basis for acquisition of property for a private use. This Court reviews a trial court's ruling regarding the admission of evidence for an abuse of discretion. *Reed v Reed,* 265 Mich App 131, 160; 693 NW2d 825 (2005).

Defendants argue that Mayor Archer testified that the city would have exercised the power of eminent domain to acquire the properties chosen by the city for casino development and that this testimony improperly suggested to the jury that no private market existed for casino development. In their only reference to the record, they state that "[t]he mayor, who identified himself in his direct examination as a former Supreme Court Justice, contended that the taking of property for such a use would 'pass' constitutional muster."

Defendants assert that they filed a "Motion to Preclude Reference to Potential Use of Eminent Domain Had Casinos Been Sited in the Subject Areas" after the mayor's deposition was taken. They do not cite the record, nor do they provide copies of the motion or the trial court's ruling, the date of the hearing, or any explanation of the court's ruling, other than to state that "the trial court denied this motion." Thus, this issue is not properly presented for appellate review.[9]

Nonetheless, the only reference made to the mayor's testimony in defendants' brief is to the cross-examination of the mayor by defense counsel. The mayor testified on direct examination, without objection, that the city might attempt to use eminent domain

---

[9] The trial court's ruling was likely based on *Poletown Neighborhood Council v Detroit,* 410 Mich 616; 304 NW2d 455 (1981), in which the Court held that the condemnation of land in Poletown to be conveyed to General Motors Corporation for the construction of new assembly plants was for a public purpose.

to assemble property for casino development.[10] The following colloquy occurred during cross-examination by defense counsel:

> *Q.* You're an attorney, of course, aren't you, Mr. Mayor?
>
> *A.* Yes.
>
> *Q.* And I believe you're a former justice of the Michigan Supreme Court?
>
> *A.* Yes.
>
> *Q.* Isn't it true that the courts might not allow the city to utilize the power of eminent domain to acquire property to accommodate casinos?
>
> *A.* I think it's unlikely because I think the predicate is set forth that the city can satisfy all of the principal requirements and meet the test that has been set forth by the Michigan Supreme Court.
>
> *Q.* And that's your opinion?
>
> *A.* You asked for my opinion. I just gave it to you.

Clearly, it was defense counsel who solicited the mayor's testimony to which defendants now object in an attempt to discredit the mayor's testimony on direct examination.

On this record, without a copy of the motion, without a transcript of the motion hearing, and without a copy of the trial court's ruling, and absent an objection to the testimony during the deposition, we cannot conclude that the trial court abused its discretion by admitting the testimony.

Finally, defendants argue that Mayor Archer gave improper opinion testimony in his deposition. Specifi-

---

[10] Further, the mere fact that the case on which the mayor apparently relied to support his opinion that eminent domain was available for use in siting casinos, *Poletown Neighborhood Council v Detroit,* 410 Mich 616; 304 NW2d 455 (1981), has been overruled by *Wayne Co v Hathcock,* 471 Mich 445; 684 NW2d 765 (2004), is not relevant in this case.

cally, they contend that the mayor prognosticated about future legislative action when he answered hypothetical questions about whether he would or would not have allowed the development of casinos absent the taking for the stadiums project. In support of this argument, defendants cite only one unpublished decision, *Nelson Drainage Dist v Book,* unpublished opinion per curiam of the Court of Appeals, issued March 29, 1995 (Docket No. 152341), and a number of foreign cases cited in that case.

Defendants do not refer to the location in the record where any objection to the testimony was made and do not refer to any ruling by the trial court. This issue is therefore not properly perfected nor preserved and, therefore, we decline to address it.[11]

### DOCKET NOS. 251869 AND 251870

### I. MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

The stadium authority first argues that it was entitled to judgment notwithstanding the verdict (JNOV) because there was no issue of fact with regard to whether the highest and best use of defendants' properties was for casino development. This Court reviews de novo a trial court's ruling on a motion for JNOV. In reviewing a trial court's denial of a motion for JNOV, this Court should examine the testimony and all legitimate inferences therefrom in the light most favorable to the nonmoving party. *Attard v Citizens Ins Co of*

---

[11] Nonetheless, we disagree with defendants' labeling of the mayor's testimony as "prognostication about future legislative action." The mayor's testimony regarding the siting of casinos was fact-based and did not involve any prognostication about future municipal legislation, because it was the mayor who recommended casino locations to the city council. Moreover, in light of our resolution, we need not address the cross-appeals.

*America,* 237 Mich App 311, 321; 602 NW2d 633 (1999). "A trial court should grant a motion for JNOV only when there was insufficient evidence presented to create an issue for the jury." *Id.*

In determining market value, one must determine the highest and best use of the property. *St Clair Shores v Conley, supra* at 462; *In re Condemnation of Lands in Battle Creek for Park Purposes, supra* at 419-420. "Highest and best use" means "the most profitable and advantageous use the owner may make of the property even if the property is presently used for a different purpose or is vacant, so long as there is a market demand for such use." SJI 2d 90.09; see also *Jack Loeks Theatres, supra* at 618-619.

> "The possibility of its use for all purposes, present and prospective, for which it is adapted and to which it might in reason be applied, must be considered. . . . Although a use reasonably likely to take place in the future can be considered the highest and best use, such future use becomes too speculative for consideration if the 'future' that is contemplated is beyond the 'near future.' To warrant admission of testimony as to the value for purposes other than that to which the land is being put, . . . the landowner must first show: (1) that the property is adaptable to the other use, (2) that it is reasonably probable that it will be put to the other use within the immediate future, or within a reasonable time, and (3) that the market value of the land has been enhanced by the other use for which it is adaptable." [*Jack Loeks Theatres, supra* at 618-619, quoting 4 Nichols, Eminent Domain (3d ed), § 12B.12.]

The stadium authority's argument that casinos would not have been approved for development on defendants' properties is premised on its assertion that the undisputed evidence established that the mayor and the city council had complete authority over the location of casinos and that Archer unequivocally testified

that he would not have approved casino development on defendants' land because of the proximity to the stadiums, to a residential development, and to Woodward Avenue. But defendants presented evidence that while Archer also stated that he did not want casino development on the riverfront, he ultimately changed his position and approved the development of casinos on the riverfront. Defendants also presented evidence of the city's interest in locating casinos in the central business district,[12] as well as of the interest of the Foxtown Group in developing a casino in the Foxtown area. In addition, defendants presented evidence that Foxtown had all the characteristics necessary and desirable for casino development. The jury is the judge of the credibility of witnesses and the truthfulness of their statements. It has the benefit of the testimony and its determination is final. The court may not disturb the jury's determination of value as long as it is within the fair range of the testimony. *In re Widening of Michigan Ave,* 298 Mich 614; 299 NW 736 (1941). In each case, it was for the jury to weigh the testimony of the witnesses to determine the highest and best use of the property and the fair market value of the property.

II. MOTION FOR NEW TRIAL

The stadium authority argues that the trial court erred by denying its motion for new trial on several grounds. This Court reviews the trial court's denial of a motion for new trial for an abuse of discretion. *Kelly v Builders Square, Inc,* 465 Mich 29, 34; 632 NW2d 912 (2001).

A. GREAT WEIGHT OF THE EVIDENCE

The stadium authority's sole argument with regard to this issue is that "for all the reasons discussed [in its

---

[12] Foxtown is in the general area of the central business district.

argument concerning JNOV], the jury did not have a sound basis in fact for determining that the highest and best use of the Property was for use in connection with a casino." As discussed in part I of this opinion, however, in light of the conflicting testimony on the question of "highest and best use," the issue was properly left to the discretion of the jury.

### B. EVIDENCE OF POSTTAKING SALES

The stadium authority argues that the trial court abused its discretion by allowing defendants' expert appraiser, Michael Ellis, to testify about comparable sales made after the dates of the takings. The stadium authority's arguments in Docket Nos. 251869 and 251870 are identical; in fact, the brief in No. 251869 contains the taking date and transcript references from No. 251870. Accordingly, in No. 251869, the stadium authority does not identify a transcript reference to an objection to the admission of the evidence. In No. 251870, the stadium authority did object to the admission of exhibits 9 and 10, showing comparable sales for casinos occurring in August 1997 and September 1997, one and two months, respectively, after the July 23, 1997, taking in No. 251870, and three and four months, respectively, after the April 4, 1997, taking in No. 251869.

In a pretrial ruling, the court ruled during a hearing on a motion to exclude "evidence that surfaced after the date of taking" that "anything that could have been known [to a willing buyer and willing seller] can be introduced . . . as substantive evidence." The court ruled on reconsideration that the court would exclude posttaking evidence relevant to the issue of fair market value to the extent that (1) the evidence was not known in some form before the taking or (2) the evidence was

not that of a comparable sale as determined by the totality of the circumstances. The court also ruled that the posttaking evidence may be admissible to impeach the credibility of witnesses.

Upon the stadium authority's objection at trial, defense counsel noted that "this has been the subject of extensive discussion in the past. The Court has ruled that if they are relatively close in time, they are fair indicators of value." The trial court stated that it "will be left for the jury to decide whether or not these are comparables."[13]

In a rather brief argument, the stadium authority argues that "post-date-of-taking valuations are totally irrelevant to determine just compensation," that "the market value of the property must be determined in light of 'all facts affecting the market value' as of the date of taking," and that "[s]ubsequent values, impacted by subsequent events, are not relevant . . . ." In support of these propositions, the stadium authority relies on four cases. *In re Urban Renewal, Elmwood Park Project,* 376 Mich 311; 136 NW2d 896 (1965), involved a dispute concerning when the taking occurred. The property owner argued that even though the condemnation action did not begin until 1962, the condemning authority had taken a series of steps designed to reduce the value of the property and thereby deprive the owner of just compensation. The trial court instructed the jury that it was to "'find the value of the property at the time of taking, which is the time of your verdict and at no other time.'" *Id.* at 314 (emphasis omitted). On appeal, the property owner successfully challenged this instruction because it advised the jury

---

[13] The trial court apparently ruled that evidence of posttaking comparable sales and valuations could be used to impeach witnesses and to confirm an expert's valuation as of the date of taking.

that the time of taking was a time subsequent to when it actually occurred. *Id.* at 320. The Court did not consider the issue presented in this case, and the case presents no support for the proposition that evidence of posttaking sales is necessarily irrelevant.

*Consumers Power I* simply explained the definition of fair market value. It made clear that comparable land sales used by appraisers are not evidence, but are merely tools to help the appraisers arrive at their estimate of a fair price and value for the condemned property. *Consumers Power I, supra* at 745. In using such tools, an appraiser must employ comparable sales for the light they shed on the value on the date of taking.

The stadium authority also relies on *Grand Rapids v Assfy*, 44 Mich App 473; 205 NW2d 502 (1973), for the proposition that it is error for the trial court to admit evidence relating to the value of the property after the date of taking when the taking has changed its value. In that case, the Court held that photographs taken after the date of the condemnation and showing "damage which would indicate vandalism" were too prejudicial to admit. *Id.* at 477. The crucial element in *Assfy* was that posttaking evidence was not relevant because of changes since the date of the taking. The stadium authority merely states in conclusory fashion that the evidence in these cases "necessarily reflected the changes in the market caused by later significant events." But the stadium authority fails to point out any basis for concluding that conditions changed.

Generally, a condemnation award is based on the fair market value at the time of the taking. *In re Edward J Jeffries Homes Housing Project,* 306 Mich 638; 11 NW2d 272 (1943). Evidence regarding value is to be liberally received. *In re Memorial Hall Site (Detroit v*

*Cristy)*, 316 Mich 215, 220; 25 NW2d 174 (1946). The determination of value is not a matter of formulas or artificial rules, but of sound judgment and discretion based on consideration of all relevant facts in a particular case. *In re Widening of Bagley Ave*, 248 Mich 1, 4; 226 NW 688 (1929).

In *State v Heirs of Halemano Kapahi*, 48 Hawaii 101, 111-112; 395 P2d 932 (1964), in addressing the issue of evidence of comparable sales, the court stated:

> "They [the courts] usually assume that if property similar in other respects has been sold within a reasonable time of the taking, its sale price is relevant in determining the market value of property taken. As to what constitutes a reasonable time, a wide discretion is vested in the trial court and the appellate courts are reluctant to reverse the lower court's determination as a matter of law. In the usual run of cases, a sale within a year is admitted as a matter of course. In any case, however, a finding that the evidence falls within a reasonable time does not imply that market conditions are precisely the same and it remains open to either party to dispute the significance of the sale by proving a change in market conditions. Generally speaking, the courts make no distinction between sales occurring prior to the taking and sales consummated after the date when title has vested in the condemner. They usually admit the latter type of evidence, sometimes qualifying their ruling by stating that the sale adduced must not be too remote in time or that there must be no drastic change in market conditions."

The test is the similarity of the lands and the reasonableness of the time of sale in order to have any application to the value of the land taken at the time of condemnation, which is the sole question before the jury.

So long as it meets the test of comparability of commodity and propinquity, evidence of commerce in land after the date of condemnation has been held competent and admissible as bearing on the value of the condemned land at the time of the taking. [Citation omitted.]

The court then concluded:

> From the foregoing authorities emerge the following
> applicable principles: Where evidence of a comparable sale
> or lease is offered, the trial judge may, in his discretion,
> admit or exclude it considering such factors as time of the
> transaction, size, shape and character of the comparable
> land, and whether there has been any enhancement or
> depression in value. It makes no difference whether the
> transaction occurred before or after the date of condemna-
> tion so long as it is not too remote a period of time and the
> land is reasonably comparable, having been neither en-
> hanced or decreased in value by the project or improvement
> occasioning the taking. The weight to be given such evi-
> dence is for the jury. The trial judge's determination as to
> admissibility or non-admissibility of such evidence will not
> be upset on appeal unless it is a clear abuse of discretion.
> See also: 18 Am.Jur., Eminent Domain, § 351; 29 C.J.S.
> Eminent Domain § 273; 30 C.J.S. Eminent Domain § 363; 4
> Nichols on Eminent Domain (3d ed.), § 12.311(3); 6 Nichols
> on Eminent Domain (3d ed.), § 26.731(2); II Wigmore on
> Evidence (3d ed.), § 463. [*Id.* at 112-113.]

The reasoning in *Heirs of Kapahi* is logical and
persuasive and not inconsistent with Michigan law. It is
within the sound discretion of the trial court whether
the sale of the property referred to took place within a
reasonable time of the taking. See *In re Jeffries, supra*
at 650. The trial court's reasoning in the present cases
follows the reasoning of the *Heirs of Kapahi* court. The
trial court did not abuse its discretion by permitting the
appraisal experts to utilize comparable sales occurring
within one to four months after the dates of taking in
determining fair market value.

The stadium authority also argues that the posttak-
ing sales evidence was improperly utilized to impeach
Archer's testimony that he had the final decision re-
garding where casinos would be located and that he
would not have approved casino development on or near

defendants' properties. The trial court's ruling admitting impeachment evidence provides no grounds for reversal. The trial court allowed posttaking evidence to be admitted solely on the question of whether Archer's position was consistent.

### C. ADMISSION OF THE MOULTON MEMO

The stadium authority argues that the admission of a document referred to as the "Moulton Memo" amounted to error requiring reversal because it was hearsay, was not authenticated, and no showing was made that Moulton was unavailable for trial. Despite a record request, a copy of the memo has not been provided to this Court.

At a hearing regarding defendants' motion to admit the Moulton Memo, the stadium authority objected to admission of the memo, arguing that it was hearsay, that it was "second-generation," and that the memo did not satisfy the requirements for admission as a business record. Defendants sought to admit the memo as a business record under MRE 803(6), and also under MRE 803(24) (equivalent circumstantial guarantee of trustworthiness).

Defendants relied on the deposition testimony of Brian Moulton, corporate director of gaming development for Harrah's casinos.[14] Harrah's, together with the North American Gaming Group, had formed a partnership known as the "Foxtown Group" to explore the possibility of off-reservation Indian gaming in the city of Detroit. Moulton apparently testified that the memo was prepared in the course of his duties and that the memo was prepared from notes taken by him at an October 10, 1994, meeting he attended to discuss casino

[14] A copy of the deposition has not been provided to this Court.

development with Archer. Moulton's memo contains the notes of a meeting with Archer, Moulton, the North American Gaming Group, and others interested in developing off-reservation Indian gaming. Moulton indicated that the memo was accurate when it was prepared while it was fresh in his mind. It was maintained in Harrah's files in the ordinary course of business. Moulton sent the draft memo to an attorney for Harrah's for review. The attorney offered comments. Moulton indicated that 12 people received a copy of the final memo, and that he never received feedback from any of them indicating that the memo was in any way inaccurate.

Defendants argued that the memo was not hearsay under the business record exception of MRE 803(6) and that the memo had equivalent circumstantial guarantees of trustworthiness under MRE 803(24). The trial court admitted the document under MRE 803(24).[15]

MRE 803(24) is the "catch-all" exception to the hearsay rule. Evidence admitted under MRE 803(24) must satisfy four elements: "(1) it must have circumstantial guarantees of trustworthiness equal to the categorical exceptions, (2) it must tend to establish a material fact, (3) it must be the most probative evidence on the fact that the offering party could produce through reasonable efforts, and (4) its admission must serve the interests of justice." *People v Katt*, 468 Mich 272, 279; 662 NW2d 12 (2003).

Considering the totality of the circumstances surrounding the memo, the memo was sufficiently trustworthy. See *id*. at 291 n 11. Factors that lead to this conclusion of reliability include that the memo was made from notes taken at the October 10, 1994, meet-

---

[15] Although not entirely clear, it also appears that the trial court admitted the memo under MRE 803(6).

ing, and that the memo was drafted shortly after the meeting. The memo was prepared to memorialize the meeting. The memo was allegedly circulated to 12 persons, at least some of whom attended the meeting, and no one apparently notified Moulton of any inaccuracies in the memo. Although the attorney may have reviewed the memo before its circulation, there is no indication that any comments made by the attorney when reviewing the memo were incorporated into the memo. The memo tended to establish what was discussed at the meeting and was the most probative documentary evidence of what was discussed at the meeting. And the general purpose of the hearsay rules, as well as the interests of justice, was best served by the admission of the memo. The trial did not abuse its discretion in ruling that the memo was admissible under MRE 803(24).

Even if the trial court erred by admitting the Moulton Memo, any error was harmless. Evidence regarding the meeting with Archer was presented to the jury through the testimony of others, including Archer and members of the Foxtown Group. The information contained in the memo was placed before the jury through the testimony of these witnesses. Thus, the memo was merely cumulative evidence. Improper admission of evidence is harmless if it is merely cumulative to other properly admitted evidence. *Sackett v Atyeo*, 217 Mich App 676, 685; 552 NW2d 536 (1996).

### D. ADMISSION OF EVIDENCE THAT TWO WITNESSES HAD A PREVIOUS AFFILIATION WITH PLAINTIFF'S COUNSEL

The stadium authority suggests that defendants were improperly permitted to introduce evidence that Archer and another witness for the stadium authority were previously affiliated with the law firm represent-

ing the stadium authority. It contends that "[t]his evidence was not relevant to the value of the Property or its highest and best use" and should have been excluded under MRE 403. Without any citation of the record or elaboration, the stadium authority asserts that "[d]efendant[s] insinuated, without any basis in fact, that the witnesses were less believable because of their former association." However, it is always permissible upon cross-examination of an adverse witness to pursue facts that may bear on a witness's bias. *People v Layher,* 464 Mich 756, 768; 631 NW2d 281 (2001); *Hayes v Coleman,* 338 Mich 371, 381; 61 NW2d 634 (1953). A witness's credibility is a primary question for the jury to evaluate, and questions eliciting bias, prejudice, or interest are appropriately allowed within the trial court's discretion. The trial court did not abuse its discretion by permitting defendants to question the witnesses about their affiliation with the stadium authority's counsel.

### E. THE STADIUM AUTHORITY'S REQUESTS REGARDING ORDER OF PROOF AND SPECIAL JURY INSTRUCTIONS AND JURY INTERROGATORIES

The stadium authority alleges error in the trial court's rulings requiring the stadium authority to present its proofs first and rejecting several special jury instructions "addressing the connection between the range of testimony and the jury's award of compensation, speculative theories, and the burden of proof." It contends that the order of proofs suggested to the jury that the stadium authority carried the burden of establishing just compensation and that the instructions given to the jury did not adequately apprise it of its need to make an award based on facts known to a buyer as of the date of taking. However, the stadium authority does not make reference to the transcript and does not

elaborate on its assertions. The stadium authority does not set forth the proposed jury instructions and does not explain why the standard jury instructions as given by the court were inadequate.

MCL 213.52 of the Uniform Condemnation Procedures Act, MCL 213.51 *et seq.*, provides that "[a]ll . . . court rules applicable to civil actions shall apply to condemnation proceedings except as otherwise provided in this act." MCR 2.507 governs trials. MCR 2.507(B) states that "[u]nless otherwise ordered by the court, the plaintiff must first present the evidence in support of the plaintiff's case." A review of the record reveals that the trial court informed the jury of the order that proofs would be presented. Nothing in the instructions suggested that the order of proofs was connected to the burden of proof.[16]

Additionally, the court instructed the jury that "the market value of the property must be determined as of [April 4, 1997, in No. 280169 and July 23, 1997, in No. 280170]" and that just compensation must be based on "what a prudent buyer could or would have known as of the date of taking." The court also instructed the jury not to consider posttaking evidence substantively:

> Some testimony was received as to actions which occurred after the date of taking on the location of casinos. I instruct you that the postdate of taking activity could not have been known by a prudent buyer before the date of taking. You may consider postdate of taking evidence when judging the credibility of witnesses.

---

[16] A Michigan standard jury instruction regarding condemnation, SJI2d 90.03, now M Civ JI 90.03, recommended that no instruction on the general burden of proof be given in condemnation cases. The comment to SJI2d 90.03 stated that "[t]here is strictly speaking no *general* burden of proof applicable to all issues in all condemnation proceedings." (Emphasis in original.) The comment specifically stated that neither party has the burden of proof on the issue of damages.

Thus, the stadium authority's arguments as presented are without factual support and are without merit.[17]

### F. THE PRESENCE OF A TAINTED JUROR
### (DOCKET NO. 251869 ONLY)

The stadium authority asserts that it is entitled to a new trial on the basis of juror bias or misconduct, MCR 2.611(A)(1)(b). On the third day of trial, a juror sent a note to the trial court indicating that she had personal knowledge of an offer to purchase the dilapidated Women's City Club in Detroit. The trial court noted that the juror had no reason to suspect that the proofs in this case would focus on the city club property. The court invited counsel to question the juror. The stadium authority's counsel asked whether, if there were testimony regarding an offer for the city club, it would affect her view of the case. The juror responded, "Yes."

Upon questioning by the court, the juror indicated that she would try to comply with the jury instruction requiring a witness to disregard any information about a particular case and to decide the case on the basis of the evidence introduced in court. After an off-the-record discussion, counsel stipulated that there was no objection to the continuation of the juror on the jury and that no basis had been presented to the court on which she could have been excused.

The following Monday, counsel for the stadium authority requested to withdraw his earlier stipulation and urged the court to excuse the juror. The trial court, noting that no testimony had been presented about the

---

[17] The stadium authority also states, without any argument or authority, that "the instructions also failed to instruct the jury on the issues of . . . speculation, and assemblage." This Court need not consider this argument that is not properly presented.

Women's City Club, concluded that there was no failure to disclose:

> There was considerable testimony about the YMCA and considerable testimony regarding DCL. And the witnesses have indicated offers that were made on that property by option or otherwise.
>
> The queation [sic] that was asked of the jurors during voir dire were questions that had to do with whether or not they owned any property in the area and whether or not they knew where the Fox Theater was and what the area was. No juror was ever asked if they had been inside buildings in close proximity. They were asked about Second City and about the Fox Theater. Therefore, this Court cannot find that the juror failed to disclose any information.
>
> There being no failure to disclose, and, frankly, no inquiry, specific inquiry made even to other jurors, the Court would not find that—find that this jury [sic] has committed any even unintentional error in not disclosing, and the information is that she is concerned about the information that has absolutely nothing to do at this point with this case.

The jurors were not questioned regarding whether they had any knowledge of the price of any buildings sold in the central business district or whether they knew details about the sale or purchase of property in the downtown area. There is no indication that the juror failed to disclose information asked of her during voir dire. Because the juror did not fail to disclose or otherwise fail to answer truthfully, the stadium authority cannot demonstrate that it would have challenged for cause or otherwise dismissed the juror. Further, the record is not sufficient to make a finding that a challenge for cause would have been successful in light of the juror's statement that she could decide the case without considering the information. In addition, the stadium authority merely speculates that the "jury's

verdict reflects this personal knowledge, and, as such, the foreperson's prejudice apparently infected the entire jury." There is no indication that the juror was biased as a result of her knowledge or that she shared information regarding the city club sale with the other members of the jury.

### G. THE ADMISSION OF EVIDENCE REGARDING FAIR MARKET VALUE (DOCKET NO. 251869 ONLY)

Without citation of the record to establish that this issue is preserved, the stadium authority asserts that it is entitled to a new trial because of the erroneous admission of testimony of casino gaming expert Robert Kleiman through the testimony of appraiser Ellis. The stadium authority contends that Kleiman's report was inadmissible and, therefore, it was error for Ellis to rely on the report. A review of the record reveals that Kleiman never testified at trial and that his deposition was not admitted. A review of Ellis's testimony reveals that Ellis never testified that he relied on Kleiman's work in forming his opinion; indeed, Kleiman's name is never mentioned. Rather, it appears that Ellis likely reviewed Kleiman's report regarding property values in other gaming cities as one of the 10,000 to 15,000 documents he reviewed in an attempt to determine fair market value. The record does not factually support the stadium authority's argument. Nonetheless, the stadium authority concedes that under the version of MRE 703 in effect at the time of trial, it was not necessary that the facts or evidence underlying an expert's opinion be admitted or even admissible. *Swanek v Hutzel Hosp,* 115 Mich App 254, 260; 320 NW2d 234 (1982). This issue is without merit.

H. THE ADMISSION OF EVIDENCE OF BUSINESS
INTERRUPTION DAMAGES (DOCKET NO. 251870 ONLY)

The stadium authority contends that the trial court
erred by allowing defendants James Wingate, Sr.; Alza-
lia City Cab Company; Transport Systems Company;
and City Cab Company to introduce evidence concern-
ing damages related to lost profits in support of their
claim for business interruption damages.

Damages resulting from business interruption are
compensable in condemnation cases, provided the dam-
ages can be proven with a reasonable degree of cer-
tainty. *Detroit v Hamtramck Community Fed Credit
Union,* 146 Mich App 155, 158; 379 NW2d 405 (1985).
But damages related to lost profits are not recoverable
in a business interruption case. See *In re Slum Clear-
ance,* 332 Mich 485, 496; 52 NW2d 195 (1952). The
stadium authority does not dispute that relocation costs
are proper business interruption damages. It contends,
however, that ongoing costs incurred as a result of the
new location, such as the increased cost of defendants'
ongoing van operations because of the new location and
the increased operations costs of defendants' new site,
simply reduce the profitability of defendants' busi-
nesses and constitute ongoing claims of lost profits.

In *Detroit v Larned Assoc,* 199 Mich App 36; 501
NW2d 189 (1993), the expert witness testified that
because of an increase in rent, an increase in advertis-
ing expenses, and a steady decline in sales revenue,
defendant Buckland-Van Wald would suffer $4,888,000
in business interruption damages as a result of the
condemnation. The expert arrived at this figure by
projecting Buckland-Van Wald's losses over the 15-year
period of its new lease and reducing the amount to
present value. On appeal, this Court held that the
expert's testimony regarding expenses such as rent and

advertising was proper and that the jury was free to accept or reject it. *Id.* at 41. However, with regard to testimony regarding the decline in sales revenue, this Court stated that

> we agree with the city that the bulk of [the expert's] testimony concerning damages related to lost profits. Whether couched in terms of a decline in sales, loss of income, or loss of earnings, we think it clear that Buckland-Van Wald's claim for damages was premised on its alleged inability to achieve its former level of profitability as a result of being forced to relocate. [*Id.* at 41-42].

In the present case, Thomas Czubiak testified that defendants would incur increased costs as a result of the need to travel to and from a location further away from the location where the bulk of defendants' business occurred. According to Czubiak, each van run would result in increased labor costs and increased van operation costs that were not incurred when defendants operated the businesses from their former location. He calculated total business interruption costs, including increased rent and advertising, at $179,181. The bulk of Czubiak's testimony regarding damages related to labor costs and increased van operation costs that are a result of being forced to relocate, damages that clearly relate to lost profits and not business interruption damages. *Larned Assoc, supra.* This testimony should not have been presented to the jury. We therefore vacate the award for business interruption damages and remand this matter to the trial court for retrial on the business interruption theory only.[18]

Docket Nos. 251799, 251800, 251801, 251802, and 251869 are affirmed. Docket No. 251870 is affirmed in part, reversed in part, and the matter is remanded. Jurisdiction is not retained.

---

[18] In light of our resolution, we need not address the cross-appeals.