DETROIT LIONS, INC v CITY OF DEARBORN

Docket Nos. 299414, 300830. Submitted May 8, 2013, at Detroit. Decided
October 22, 2013, at 9:00 a.m. Leave to appeal sought.

Detroit Lions, Inc. and WCF Land, LLC filed petitions in the
Michigan Tax Tribunal (MTT), challenging the ad valorem taxa-
tion of certain real property commonly known as the Detroit Lions
headquarters and practice facility, as well as the associated tan-
gible personal property, by the city of Allen Park and the city of
Dearborn for the tax years 2004 through 2009. A portion of the
real property and personal property is located in and taxed by
Dearborn and the other portion of the real and personal property
is located in and taxed by Allen Park. Ford Motor Land Develop-
ment Corporation, the original developer and owner of the practice
facility, entered into a 30-year lease with the Detroit Lions and the
lease granted the Detroit Lions an option to purchase the practice
facility. The option to purchase was assigned to William Clay Ford,
Sr., who formed WCF Land, a single-member limited liability
company, which in turn exercised the option and purchased the
practice facility from Ford Land on March 25, 2004. The MTT
concluded that Allen Park could not uncap the taxable value of the
real property following the March 25, 2005, sale and transfer of the
facility because under MCL 211.27a(7)(l), it constituted a transfer
or ownership between related companies. The MTT also deter-
mined the true cash value of the real and personal property for the
tax years in question. In Docket No. 299414, Allen Park appealed
the MTT's uncapping decision and petitioners cross-appealed the
MTT's determination of the true cash value of the real property. In
Docket No. 300830, petitioners appealed the MTT's method of
determining the true cash value of the personal property.

The Court of Appeals *held*:

1. Under Mich Admin Code, R 792.10247(12)(b), the tribunal
may enter an order consolidating matters over which it has
acquired jurisdiction. The MTT properly consolidated MTT
Docket Nos. 00-314349 and 00-307900 and entered a single, final
decision pertaining to both cases. Allen Park, which was an
aggrieved party in MTT Docket No. 00-314349, became an ag-
grieved party with respect to the consolidated, unified proceeding

because the tribunal properly consolidated those claims and the claims had effectively merged and become one unified proceeding by the time the claim of appeal was filed in the Court of Appeals in Docket No. 299414. Accordingly, in Docket No. 299414 Allen Park was entitled to claim an appeal from both MTT Docket Nos.

2. MCL 211.27a(3) provides that under certain circumstances, when a transfer of ownership occurs, the taxable value of property may be reassessed, or uncapped, according to the following year's state equalized value, when property is sold or transferred. A transfer of ownership is the conveyance of title to or a present interest in property, including the beneficial use of the property, the value of which is substantially equal to the value of the fee interest. However, under MCL 211.27a(7)(*l*), a transfer of real property or other ownership interests among entities that are commonly controlled does not give rise to uncapping. Only the actual entities involved in a transfer of real property or other ownership interests are relevant when determining whether the parties are commonly controlled for purposes of MCL 211.27a(7)(*l*); the existence of a lease of the real property being transferred, without more, is not relevant for purposes of a common-control analysis. In Docket No. 299414, the MTT erred when it determined that WCF Land's purchase of the practice facility from Ford Land was a transfer of ownership between related companies so that the taxable value of the property could not be uncapped. Ford Land and WCF Land are not commonly controlled entities within the meaning of MCL 211.27a(7)(*l*); while the Detroit Lions and WCF Land are commonly controlled, WCF Land is entirely owned by William Clay Ford, Sr. and Ford Land is a corporate entity that is not controlled by Mr. Ford. The purchase transaction involved only Ford Land and WCF Land; it was irrelevant that the Detroit Lions had possession of the practice facility under the terms of the lease because it was not a party to the transfer of the property.

3. In general, property must be assessed at 50 percent of its true cash value, which is the most probable price that a willing buyer and a willing seller would arrive at through arm's length negotiation. A property's highest and best use is the most profitable and advantageous use the owner may make of the property even if the property is presently used for a different purpose or is vacant, so long as there is a market or demand for such use. The use must be legally permissible, financially feasible, maximally productive, and physically possible. A property's existing use may be indicative of the use to which a potential buyer would put the property and is relevant to the fair market value of the property.

Even if a property has a special purpose and limited market, its existing use may still constitute its highest and best use. The MTT did not err by concluding that the highest and best use of the property as improved was its existing use as an integrated professional football team headquarters and practice facility. The MTT's rejection of the alternative highest and best use asserted by petitioners was supported by competent, material, and substantial evidence because local zoning laws did not allow such use. In addition, the alternative highest and best use would have substantially decreased the property's value, which would violate the principle of highest and best use.

4. The MTT has discretion to select the valuation approach that provides the most accurate valuation under the individual circumstances of every case. The cost-less-depreciation method is appropriate for valuing special-purpose properties with a limited or inadequate market. In Docket No. 299414, the MTT did not legally err by determining that a modified cost-less-depreciation approach, based on the original build-to-suit cost, provided the most accurate value of the special-purpose practice facility and the MTT's true cash value determinations were supported by competent, material, and substantial evidence on the whole record.

5. Tangible personal property must be taxed on the basis of its true cash value. The petitioner has the burden of proof in establishing the true cash value of property and the MTT must apply its expertise to the facts of the case and make an independent determination of true cash value. In Docket No. 300830, the MTT properly determined that petitioners' personal property appraiser was not credible and that petitioners did not meet their burden of proof in establishing true cash value. However, the MTT committed an error of law when it simply accepted respondents' personal property valuation rather than conducting an independent determination of true cash value. The MTT failed to consider the other traditional methods of determining true cash value and failed to determine the approach that most accurately reflected the value of the property. Because the MTT did not consider the other approaches and reconcile the values derived thereunder, the Court could not determine whether the valuation method utilized by respondents' appraiser and relied on by the MTT provided an accurate true cash value of the personal property in this case.

In Docket No. 299414, the MTT's conclusion that the sale and transfer of the practice facility from Ford Land to WCF Land did not give rise to uncapping of the property's value is reversed and its determination of true cash value for years 1994 through 1999 is

affirmed. In Docket No. 300830, reversed and remanded to the MTT for an independent determination of the true cash value of the personal property.

TAXATION — PROPERTY TAX — TAXABLE VALUE — TRANSFER OF PROPERTY — UNCAPPING — COMMONLY CONTROLLED ENTITIES.

MCL 211.27a(3) provides that under certain circumstances, when a transfer of ownership occurs, the taxable value of property may be reassessed, or uncapped, according to the following year's state equalized value, when property is sold or transferred; a transfer of ownership is the conveyance of title to or a present interest in property, including the beneficial use of the property, the value of which is substantially equal to the value of the fee interest; under MCL 211.27a(7)(*l*), a transfer of real property or other ownership interests among entities that are commonly controlled does not give rise to uncapping; only the actual entities involved in a transfer of real property or other ownership interests are relevant when determining whether the parties are commonly controlled for purposes of MCL 211.27a(7)(*l*); the existence of a lease of the real property being transferred, without more, is not relevant for purposes of a common-control analysis.

*Hoffert & Associates, PC* (by *Myles B. Hoffert* and *David B. Marmon*), for Detroit Lions, Inc. and WCF Land, LLC.

*Secrest Wardle* (by *Stephanie Simon Morita*) for the city of Dearborn.

*Dykema Gossett PLLC* (by *Carl Rashid, Jr.* and *Paul M. Mersino*), for city of Allen Park.

Before: BECKERING, P.J., and JANSEN and M. J. KELLY, JJ.

JANSEN, J. The instant consolidated appeals involve the ad valorem taxation of certain real property, commonly known as the Detroit Lions headquarters and practice facility ("practice facility" or "the real property"), as well as the associated tangible personal property ("the personal property"), by the city of Dearborn

("Dearborn") and the city of Allen Park ("Allen Park") (collectively "respondents"). In Docket No. 299414, Allen Park appeals by right the final decision of the Michigan Tax Tribunal ("MTT" or "tribunal") prohibiting it from uncapping the taxable value of the practice facility following a sale and transfer of the real property on March 25, 2004. Petitioners Detroit Lions, Inc. ("Detroit Lions") and WCF Land, LLC ("WCF Land") (collectively "petitioners") cross-appeal a different provision of that MTT decision determining the true cash value of the real property. In Docket No. 300830, petitioners appeal by right a second MTT decision, specifically challenging the MTT's method of determining the true cash value of the personal property. In Docket No. 299414, we affirm in part and reverse in part. In Docket No. 300830, we reverse and remand for further proceedings consistent with this opinion.

## I. BACKGROUND AND PROCEDURAL HISTORY

The factual background of these appeals, while complex and protracted, is not in serious dispute. The practice facility consists of approximately 232.25 acres of land, a two-story office building, a practice building with an indoor football field, an outdoor football field, a par-three golf hole, and certain other outbuildings. The practice facility is situated partly in Dearborn and partly in Allen Park. The personal property located at the practice facility includes, but is not limited to, furniture, athletic training equipment, computer equipment, office machines, video and broadcast equipment, telephones, kitchen equipment, file cabinets, a chiropractic table, turf care equipment, and certain collectibles and antiques. Eighty-two percent of the real property is taxed by Dearborn and 18 percent of the real

property is taxed by Allen Park. This 82/18 split generally governs the taxation of the personal property as well.

The practice facility was originally constructed by Ford Motor Land Development Corporation ("Ford Land") and was completed in 2000 or 2001. In 2001, Ford Land and the Detroit Lions entered into a renewable, 30-year lease by which the Detroit Lions agreed to lease the practice facility with an option to purchase. According to Detroit Lions Senior Vice President and Chief Financial Officer J. Thomas Lesnau, the Detroit Lions never exercised this option to purchase the practice facility because "[t]he Lions did not have the money to do that." Instead, the option to buy was assigned to William Clay Ford, Sr. Mr. Ford formed a single-member limited liability company, WCF Land, which exercised the option and purchased the practice facility from Ford Land on March 25, 2004. WCF Land paid $44,015,000 for the practice facility, of which $2,386,731 represented the value of the personal property, and $41,628,269 represented the value of the real property. As part of the sale, WCF Land acquired all of Ford Land's interest in the long-term lease with the Detroit Lions, and the Detroit Lions continued as lessee under the original lease agreement.

On June 14, 2004, the Detroit Lions commenced MTT Docket No. 00-307900 by filing a petition requesting a review of Dearborn's assessment of the practice facility for tax year 2004. On May 3, 2005, WCF Land commenced MTT Docket No. 00-314349 by filing a petition requesting a review of Allen Park's assessment of the practice facility for tax year 2005. Over the course of the next several years, the Detroit Lions and WCF Land filed numerous motions seeking to amend their petitions to add subsequent tax years.

These motions were granted, and petitioners ultimately challenged both respondents' assessments of the practice facility for tax years 2004 through 2009. MTT Docket Nos. 00-307900 and 00-314349 were eventually consolidated.

On May 3, 2005, WCF Land commenced MTT Docket No. 00-314348 by filing a petition requesting review of the assessment of a certain portion of the personal property for tax year 2005. The Detroit Lions thereafter commenced MTT Docket No. 00-315349 by filing a petition requesting a review of the assessment of a different portion of the personal property for tax year 2005. The following year, the Detroit Lions commenced MTT Docket No. 00-327111 by filing a separate petition challenging the assessment of certain items of personal property for tax year 2006. WCF Land commenced MTT Docket No. 00-327112 by filing a separate petition challenging the assessment of certain other items of personal property for tax year 2006. On June 28, 2008, the Detroit Lions commenced MTT Docket No. 00-352900 by filing a petition claiming that Dearborn had improperly taxed certain items of personal property. MTT Docket Nos. 00-314348, 00-315349, 00-327111, 00-327112, and 00-352900 were ultimately consolidated. The Detroit Lions and WCF Land filed numerous motions seeking to amend their petitions to add subsequent tax years. In the end, these motions were granted and petitioners challenged respondents' assessments of the personal property for tax years 2005 through 2009.

A hearing was conducted before the MTT during December 2009 and April 2010. The MTT considered Allen Park's contention that it was entitled to uncap the taxable value of the practice facility following its sale and transfer on March 25, 2004. Specifically, the MTT took evidence concerning whether WCF Land's pur-

chase of the practice facility from Ford Land on March 25, 2004, was a transfer between entities under common control.

With regard to the personal property, petitioners introduced valuation evidence through the testimony of J. Michael Clarkson, a personal property appraiser from Austin, Texas. Clarkson testified that he had visited the practice facility once in 2003, and again in 2005, to inspect and inventory the personal property. Clarkson determined the value for each item of personal property according to its highest and best use, i.e., the purpose for which the item was originally designed or manufactured. Clarkson's appraisal encompassed approximately 1,000 items of personal property. Some items were owned by the Detroit Lions and some were owned by WCF Land. Clarkson testified that he did not know which items were owned by the Detroit Lions and which were owned by WCF Land.

Clarkson predominantly used the market-comparison method rather than the income method or cost-less-depreciation method to value the items of personalty. Clarkson opined that the market-comparison method best reflects the usual selling price, and therefore the true cash value, of an asset. Clarkson used market comparables from Internet e-commerce sites. Clarkson explained that many appraisers now use market comparable data from e-commerce sites instead of data from trade catalogues, as was used in times past. In appraising the personal property, Clarkson relied on current retail prices of comparable items, such as eBay "buy-it-now" prices. Clarkson did use the cost-less-depreciation method to appraise certain items of personal property that were unique and did not have an active secondary market.

After making his appraisal, Clarkson submitted a written report, which was admitted into evidence by the MTT over the objection of Dearborn's attorney. Clarkson concluded that the aggregate true cash value of the personal property was $1,620,000 for tax year 2005, $1,450,000 for tax year 2006, $1,280,000 for tax year 2007, $1,330,000 for tax year 2008, and $1,200,000 for tax year 2009.[1]

The parties disagreed as to whether Clarkson had seen and taken into account every item of personal property at the practice facility. Counsel for Dearborn suggested that Clarkson had missed several items during his appraisal and repeatedly attacked Clarkson's market-comparables technique as unreliable. Clarkson admitted that he could not remember which depreciation tables he had used with respect to certain items and that he had missed a few items of personal property during his appraisal, such as a washer and dryer. Nonetheless, he maintained that his appraisal was accurate. Dearborn's attorney asserted that Clarkson was "being purposely evasive" or "incompetent."

Lesnau testified that some of the personal property had been brought to the practice facility from the Detroit Lions' former headquarters in Pontiac, and some of the personal property had been acquired by the Detroit Lions after moving to the practice facility. Moreover, some of the personal property had been acquired directly from Ford Land. Lesnau testified that the NFL considered the practice facility to be "state of

---

[1] A separate document listed 10 additional items of property that were fixed to the buildings, such as wiring, doors, built-in lockers, auditorium seating, and kitchen hoods. The value of these items was not included in Clarkson's report because it was not clear whether these items should be assessed as personalty or realty. The total value of these 10 items was approximately $100,000. The parties agreed that it was for the MTT to determine whether these 10 items were personalty or realty.

the art" when it was built, but that much of the equipment had become obsolete in the intervening years.

Lesnau testified that he provided Clarkson a list of new assets that were acquired and old assets that were discarded or eliminated for each tax year through 2008. Clarkson used this information in his report. However, counsel for Dearborn questioned whether Clarkson had actually received a list of new acquisitions for 2008.

Lesnau testified that he walked through the practice facility in 2003 with Mr. Lott, inspected the personal property, and identified which items of personalty belonged to Ford Land and which items belonged to the Detroit Lions. Lesnau testified that Clarkson was not present during this inspection and walk-through, but that Clarkson had visited the premises previously and had walked through the practice facility at that time. Lesnau testified that it took one day to conduct the walk-through and two days to compile a list of the items of personal property that were inspected.

Counsel for Dearborn attacked Clarkson's methods and credibility. Counsel took issue with Clarkson's values for a number of items of personal property. Counsel also asserted that Clarkson had lied when he stated that he had made a "three-day inspection" of the practice facility because, as Lesnau had testified, Clarkson did not actually conduct the inspection and inventory in person but instead sent Lott. Counsel questioned Clarkson's representation that he was never informed which assets belonged to WCF Land and which assets belonged to the Detroit Lions. She pointed out that Lesnau had testified that he gave Clarkson this information prior to the generation of his report. Lastly,

counsel for Dearborn noted that Clarkson had failed to determine any value for several items of personal property.

Alphonso Consiglio, a certified personal property examiner, testified for respondents. Consiglio attempted to audit the personal property statements by reconciling the actual personal property disclosures by petitioners with the items listed in Clarkson's report. Consiglio then performed a valuation of all the personal property by applying State Tax Commission ("STC") multiplier tables to the original costs of the various assets. Consiglio identified several discrepancies between Clarkson's report and the list of assets that were known to be present at the practice facility. Many newly acquired assets were not accounted for in Clarkson's report. Similarly, Clarkson's report failed to account for the disposal or elimination of other obsolete assets over time. Consiglio testified that numerous items of the personal property were altogether missing from Clarkson's report. For instance, Consiglio believed that there was approximately $1,273,078 in true cash value missing from Clarkson's report with respect to the personal property for tax year 2005, $1,121,863 missing for tax year 2006, $989,021 missing for tax year 2007, $891,789 missing for tax year 2008, and $799,594 missing for tax year 2009. After applying the STC multiplier tables, Consiglio concluded that the total true cash value of the personal property owned by the Detroit Lions was: $1,958,153 for tax year 2005, $1,446,817 for tax year 2006, $1,315,731 for tax year 2007, $1,294,634 for tax year 2008, and $1,201,829 for tax year 2009. Consiglio concluded that the total true cash value of the personal property owned by WCF Land was: $1,783,292 for tax year 2005, $1,573,048 for tax year 2006, $1,381,341 for tax year 2007, $1,239,878 for tax year 2008, and $1,110,853 for tax year 2009.

With respect to the real property, the MTT heard extensive testimony concerning the market price per square foot for office building space, open fields, and other commercial real property within the cities of Dearborn and Allen Park. The MTT took considerable testimony concerning the nature and type of buildings at the practice facility, the size and layout of the buildings, the fixtures and amenities in the buildings, the plumbing and wiring, the floor plans, and other similar details. There was also extensive testimony concerning the landscaping, the grounds, and the par-three golf hole located on the property. The MTT heard testimony regarding various methods of appraising other sports facilities located around the country. Real estate appraiser David Bur testified that, assuming the practice facility was not for sale together with the entirety of Detroit Lions operation, the highest and best use of the real property was as an office complex or "office industrial facility."

The MTT issued its decisions on July 12, 2010. The tribunal first addressed the issue of uncapping the taxable value of the real property following the sale and transfer of March 25, 2004. The MTT found that although the transfer by deed on March 25, 2004, would have otherwise constituted a "transfer of ownership" under MCL 211.27a(6)(a), it did not in this particular case because "the subject property is owned by corporations under common control." The MTT ultimately concluded that, pursuant to MCL 211.27a(7)(*l*), WCF Land's purchase of the practice facility from Ford Land on March 25, 2004, was a "transfer of ownership[] between related companies and, therefore, the taxable value of the property is not uncapped."

The tribunal next addressed the real property valuation for tax years 2004 through 2009. The MTT found

it "difficult . . . to understand" how the practice facility, for which WCF Land had paid $41,628,269 in 2004, could have lost more than half its value in only two years as petitioners asserted. After considering the totality of the testimony and exhibits, the MTT concluded that the best evidence of the true cash value of the real property was the initial cost to acquire and build the practice facility. The MTT determined that the build-to-suit cost of $33,000,000 was the best evidence of the true cash value of the practice facility's buildings in 2004. Regarding the value of the land, itself, the MTT found that the $5,470,000 figure proposed by petitioners "appears reasonable for the area and [will be] used to determine the value of the subject property." Adding these sums together, the MTT determined that the total true cash value of the real property was $38,470,000 for tax year 2004. Given the evidence concerning the fluctuation in land values between 2005 and 2009, as well as the evidence concerning depreciation of the buildings, the MTT set the following true cash values for the real property for the remaining years: $39,734,700 for tax year 2005, $39,772,200 for tax year 2006, $36,650,500 for tax year 2007, $34,020,000 for tax year 2008, and $31,510,000 for tax year 2009. Applying the abovementioned 82/18 split, the MTT then calculated the true cash value taxable by Dearborn and the true cash value taxable by Allen Park for tax years 2004 through 2009.

In its second decision, the tribunal addressed the true cash value of the personal property for tax years 2005 through 2009. The MTT considered the valuation testimony presented by the parties. The MTT determined that the cost-less-depreciation values provided by Consiglio were more accurate than the Internet-based values provided by Clarkson. The tribunal noted that the Internet-based approach em-

ployed by Clarkson "*can* be a reliable method." However, the tribunal concluded that the valuation evidence presented by Clarkson lacked credibility because of significant contradictions and discrepancies in Clarkson's testimony and the fact that Clarkson had missed many items of personal property during his appraisal. For instance, the MTT discredited Clarkson's testimony that the age of a piece of equipment does not affect its value. The MTT also noted that Clarkson had misrepresented the nature and extent of his appraisal. In addition, even though Lesnau had provided Clarkson a list of assets belonging to the Detroit Lions and a comparable list of assets belonging to WCF Land, and even though Clarkson claimed to have personally inventoried the assets on site at the practice facility, Clarkson was unable to distinguish between his asset valuations for the two entities. Lastly, during the five years that the matter was pending, Clarkson had failed to identify true comparables for certain assets and had made no adjustments for depreciation over time with respect to several of his original valuations. The MTT concluded that Clarkson's testimony was "inconsisten[t]" and "damaged," and agreed with respondents that "Clarkson's whole methodology" was "slipshod in nature." The MTT also concluded that Clarkson's insistence on the use of resale prices rather than original acquisition prices was "illogical" and that Clarkson had provided "insufficient documentation for adjustments" over time. The tribunal noted that Clarkson did "not apply time-relevant sales or adjustments" or "contemporary sales of similar property," but instead made adjustments based entirely on his own unsupported opinions which he could not effectively defend when questioned.

In addition to its conclusions concerning Clarkson's credibility, the MTT found that petitioners' appraisal data were vague, inconsistent, and "fraught with errors." The tribunal noted that many of petitioners' data were based on sales and listings of dissimilar items, and that Clarkson had failed to place a value of any kind on approximately $2,100,000 worth of assets owned by WCF Land. Indeed, the MTT explained that Clarkson had entirely omitted numerous assets from his valuation reports. When questioned, Clarkson was unable to explain why this had happened.

In contrast, the MTT generally accepted the valuation evidence presented by respondents, including their audit report.[2] The MTT observed that Consiglio had reviewed petitioners' personal property statements and had then applied the STC multiplier tables to the original costs of the assets. Although respondents' proposed values were based on petitioners' personal property statements rather than an independent, on-site inventory, the tribunal found that respondents' valuations were more accurate because Consiglio had taken into account all items of personalty in his report, including those items that had been omitted by Clarkson.

With respect to that portion of the personal property owned by the Detroit Lions, the tribunal set the following true cash values: $1,958,153 for tax year 2005, $1,446,817 for tax year 2006, $1,315,731 for tax year 2007, $1,294,634 for tax year 2008, and $1,201,829 for tax year 2009. With respect to that portion of the personal property owned by WCF Land, the tribunal set

[2] However, the MTT did agree with petitioners' contention that certain items of personalty had already been included in the valuation of the real property, and therefore excluded those items from its determination of the personal property's true cash value.

the following true cash values: $1,347,168 for tax year 2005, $1,193,565 for tax year 2006, $1,051,465 for tax year 2007, $951,011 for tax year 2008, and $855,621 for tax year 2009.

Petitioners filed a motion for reconsideration of the MTT's decision concerning the valuation of the personal property. On October 8, 2010, the tribunal denied their motion for reconsideration.

In Docket No. 299414, Allen Park filed its claim of appeal with this Court on July 30, 2010. Petitioners filed their claim of cross-appeal on August 18, 2010. In Docket No. 300830, petitioners filed their claim of appeal with this Court on October 28, 2010. We consolidated the appeals on March 30, 2011. *Detroit Lions, Inc v Dearborn*, unpublished order of the Court of Appeals, entered March 30, 2011 (Docket Nos. 299414, 300830).

## II. STANDARDS OF REVIEW

Our review of a final decision of the MTT is limited. *Malpass v Dep't of Treasury*, 494 Mich 237, 245; 833 NW2d 272 (2013). Because fraud is not alleged in this case, we review the tribunal's decision for misapplication of the law or adoption of a wrong principle. Const 1963, art 6, § 28; *Briggs Tax Serv, LLC v Detroit Pub Sch*, 485 Mich 69, 75; 780 NW2d 753 (2010). The MTT's factual findings are conclusive if they are supported by competent, substantial, and material evidence on the whole record. Const 1963, art 6, § 28; see also *Mich Bell Tel Co v Dep't of Treasury*, 445 Mich 470, 476; 518 NW2d 808 (1994). "Substantial evidence is any evidence that reasonable minds would accept as sufficient to support the decision[.]" *In re Grant*, 250 Mich App 13, 18-19; 645 NW2d 79 (2002). "Substantial evidence must be more than a scintilla of evidence, although it may be substantially less than a preponderance of the

evidence." *Jones & Laughlin Steel Corp v City of Warren*, 193 Mich App 348, 352-353; 483 NW2d 416 (1992).

When statutory interpretation is involved, we review de novo the MTT's decision. *Briggs Tax Serv*, 485 Mich at 75. Clear and unambiguous statutory language must be applied as written. *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999). Whether this Court has jurisdiction is a question of law that we consider de novo. *Chen v Wayne State Univ*, 284 Mich App 172, 191; 771 NW2d 820 (2009).

### III. DEARBORN'S JURISDICTIONAL CHALLENGE

In Docket No. 299414, Dearborn argues that Allen Park was not entitled to claim an appeal with regard to both MTT Docket No. 00-314349 and MTT Docket No. 00-307900 because it was an aggrieved party in MTT Docket No. 00-314349 only. This argument is without merit. As explained, MTT Docket Nos. 00-314349 and 00-307900 were consolidated, and the tribunal entered a single, final decision pertaining to both cases.

The MTT may enter an order consolidating matters over which it has acquired jurisdiction. Mich Admin Code, R 792.10247(12)(b); see also MCL 205.732(c) and (d). A "final order or decision" of the MTT is appealable to this Court as a matter of right. MCL 205.753(1) and (2). Because the tribunal properly consolidated MTT Docket Nos. 00-314349 and 00-307900, and entered a single, final decision with regard to both cases, the cases had effectively merged and become one unified proceeding by the time the claim of appeal was filed in this Court. The claims and parties in MTT Docket Nos. 00-314349 and 00-307900 could have been joined in a single proceeding from the inception. Cf. *Chen*, 284 Mich App at 197.

Moreover, the present situation did not mandate the entry of a separate decision in each original case. Cf. *People ex rel MacMullan v Babcock*, 38 Mich App 336, 343; 196 NW2d 489 (1972). We conclude that Allen Park was an aggrieved party with respect to the entire merged, unified proceeding; its claim of appeal was therefore proper. See MCR 7.203(A)(2).

### IV. DOCKET NO. 299414

Allen Park argues on appeal that it should have been permitted to uncap the taxable value of the practice facility following the transfer of that property from Ford Land to WCF Land on March 25, 2004, because Ford Land and WCF Land are not "commonly controlled" within the meaning of MCL 211.27a(7)(*l*). Petitioners argue on cross-appeal that the MTT committed an error of law and adopted a wrong principle when it determined the true cash value of the practice facility without regard for the property's highest and best use and usual selling price. Petitioners also argue that there was not competent, material, and substantial record evidence to support the MTT's valuation of the practice facility. We address these arguments in turn.

### A. UNCAPPING THE TAXABLE VALUE

The MTT committed an error of law by concluding that the sale and transfer of the practice facility from Ford Land to WCF Land on March 25, 2004, did not give rise to uncapping the property's taxable value.

Under certain circumstances, the taxable value of property may be reassessed according to the following year's state equalized value upon the sale or transfer of the property. MCL 211.27a(3); *Schwass v Riverton Twp*, 290 Mich App 220, 222; 800 NW2d 758 (2010). "This is

known as 'uncapping' the taxable value." *Schwass*, 290 Mich App at 222. "Uncapping occurs whenever a 'transfer of ownership' occurs." *Id.*, quoting MCL 211.27a(3). "Transfer of ownership" is defined as "the conveyance of title to or a present interest in property, including the beneficial use of the property, the value of which is substantially equal to the value of the fee interest." MCL 211.27a(6). "The statute lists several types of conveyances that qualify as a 'transfer of ownership,' including '[a] conveyance by deed.' " *Schwass*, 290 Mich App at 222, quoting MCL 211.27a(6)(a). However, MCL 211.27a(7) enumerates "certain types of conveyances that are excepted from this definition and do not give rise to uncapping." *Schwass*, 290 Mich App at 222. Among other things, "[a] transfer of real property or other ownership interests among . . . entities . . . [that] are commonly controlled" does not give rise to uncapping. MCL 211.27a(7)(*l*).

Ford Land and WCF Land are not "commonly controlled" within the meaning of MCL 211.27a(7)(*l*). We acknowledge that the Detroit Lions and WCF Land are commonly controlled entities. The evidence established that WCF Land is entirely owned by William Clay Ford, Sr., and that the Detroit Lions is controlled by Mr. Ford, his wife, and his children. However, it is undisputed that Ford Land, a corporate entity that is entirely separate from the Detroit Lions, is not under the control of Mr. Ford.

The sale and transfer of the practice facility on March 25, 2004, took place exclusively between Ford Land and WCF Land. The Detroit Lions was not involved in the sale and transfer. It is irrelevant for purposes of MCL 211.27a(7)(*l*) that the Detroit Lions had possession of the practice facility, both before and after the sale, under the terms of the long-term lease.

The fact remains that the Detroit Lions was not a party to the transfer of the property.

Because Ford Land and WCF Land are not under common control, the sale and transfer of March 25, 2004, was not "[a] transfer of real property or other ownership interests among . . . entities [that] are commonly controlled." MCL 211.27a(7)(*l*). Accordingly, the sale and transfer of the practice facility by deed on March 25, 2004, was a "transfer of ownership," MCL 211.27a(6)(a), and necessarily gave rise to uncapping the practice facility's taxable value, MCL 211.27a(3). Furthermore, it does not matter that the practice facility's taxable value had already been uncapped when the Detroit Lions initially entered into the long-term lease with Ford Land in 2001. See MCL 211.27a(6)(g). The statute does not limit the number of times that a parcel's taxable value may be uncapped. The MTT committed an error of law when it determined that WCF Land's purchase of the practice facility from Ford Land on March 25, 2004, was a "transfer of ownership between related companies and, therefore, the taxable value of the property is not uncapped." We conclude that Allen Park was entitled to uncap the taxable value of the practice facility at the time the property was transferred from Ford Land to WCF Land on March 25, 2004. See MCL 211.27a(6)(a).[3] We therefore reverse the decision of the tribunal on this issue.

---

[3] We fully acknowledge that, under the terms of the long-term lease, the Detroit Lions had possession of the practice facility. However, the fact remains that the practice facility was *owned* by Ford Land until the sale of March 25, 2004. We therefore reject any attempt by petitioners to characterize the sale of March 25, 2004, as an "equitable" or "constructive" transfer of the property from the Detroit Lions to WCF Land. The Detroit Lions merely held a leasehold interest in the property; a leasehold interest is different from an ownership interest. See *Adams Outdoor Advertising v East Lansing (After Remand)*, 463 Mich 17, 25 n 5; 614

### B. TRUE CASH VALUE OF PRACTICE FACILITY

"[T]rue cash value" is the starting point for determining the taxable value of real and tangible personal property in Michigan. Const 1963, art 9, § 3; *Wayne Co v State Tax Comm*, 261 Mich App 174, 178; 682 NW2d 100 (2004); see also *Meadowlanes Ltd Dividend Housing Ass'n v Holland*, 437 Mich 473, 483; 473 NW2d 636 (1991). In general, property must be assessed at 50 percent of its true cash value. Const 1963, art 9, § 3; MCL 211.27a(1); see also *WPW Acquisition Co v Troy*, 250 Mich App 287, 298; 646 NW2d 487 (2002). "[T]rue cash value" is defined in relevant part as "the usual selling price . . . that could be obtained for the property at private sale, and not at auction sale . . . ." MCL 211.27(1). "True cash value is synonymous with fair market value," *WPW Acquisition*, 250 Mich App at 298; see also *Jones & Laughlin*, 193 Mich App at 353, and refers to "the probable price that a willing buyer and a willing seller would arrive at through arm's length negotiation," *Huron Ridge LP v Ypsilanti Twp*, 275 Mich App 23, 28; 737 NW2d 187 (2007). The Legislature has provided the following nonexhaustive list of factors that should be considered in determining a property's true cash value:

> [T]he advantages and disadvantages of location; quality of soil; zoning; existing use; present economic income of structures, including farm structures; present economic income of land if the land is being farmed or otherwise put to income producing use; quantity and value of standing timber; water power and privileges; minerals, quarries, or other valuable deposits not otherwise exempt under this act known to be available in the land and their value. [MCL 211.27(1).]

---

NW2d 634 (2000). The sale and transfer of March 25, 2004, took place exclusively between Ford Land and WCF Land. The Detroit Lions was not a party to the transfer.

Petitioners assert that the tribunal committed legal error by concluding that the highest and best use of the property as improved was its existing use as a practice facility. Petitioners also contend that the tribunal improperly rejected their proposed alternative highest and best uses for the property as improved. We disagree. The concept of "highest and best use" is fundamental to the determination of true cash value. See *Detroit/Wayne Co Stadium Auth v Drinkwater, Taylor & Merrill, Inc*, 267 Mich App 625, 633; 705 NW2d 549 (2005). " 'Highest and best use' means 'the most profitable and advantageous use the owner may make of the property even if the property is presently used for a different purpose or is vacant, so long as there is a market demand for such use.' " *Id*. at 633 (citation omitted). A highest and best use determination "requires simply that the use be legally permissible, financially feasible, maximally productive, and physically possible." *Detroit v Detroit Plaza Ltd Partnership*, 273 Mich App 260, 285; 730 NW2d 523 (2006). "[I]t is the duty of the tribunal to hypothesize the highest probable price at which a sale would take place." *Safran Printing Co v Detroit*, 88 Mich App 376, 382; 276 NW2d 602 (1979). "[E]xisting use may be indicative of the use to which a potential buyer would put the property and is, therefore, relevant to the fair market value of the property." *Id*.

The MTT specifically considered and rejected the alternative highest and best uses proposed by petitioners. The tribunal found that the local zoning laws would not permit using the property as an industrial facility. See *Detroit Plaza*, 273 Mich App at 285. The tribunal further determined that using the property as an office complex or technology park would substantially decrease the property's value, and that such alternative uses therefore "violate[d] the princip[les] of highest and best use." These findings were supported by competent,

material, and substantial evidence. The MTT did not misapply the law or adopt a wrong principle when it determined that the practice facility's highest and best use was its existing use. See *Briggs Tax Serv*, 485 Mich at 75. The evidence established that petitioners' use of the property as an integrated professional football team headquarters and practice facility was the most profitable use to which the property could feasibly be put. See *Stadium Auth*, 267 Mich App at 633.

We recognize that the MTT may not determine a property's true cash value solely on the basis of its current use "where such use bears no relationship to what a likely buyer would pay for the property[.]" *Safran*, 88 Mich App at 382. However, the *Safran* Court did not hold that a property's existing use could never be used to determine its usual selling price. *Clark Equip Co v Leoni Twp*, 113 Mich App 778, 783; 318 NW2d 586 (1982). In *Safran*, 88 Mich App at 382, the property was being used as a printing plant, even though this use was obsolete and it was undisputed that no buyer would purchase the property for this purpose. Accordingly, the property's existing use was not its highest and best use. *Id*. In the present case, conversely, the MTT's valuations were based on record evidence tending to show what a likely buyer would pay for the property. There was competent, material, and substantial evidence on the whole record to support the tribunal's determination that the practice facility's existing use was its highest and best use. See *Great Lakes Div of Nat'l Steel Corp v Ecorse*, 227 Mich App 379, 408; 576 NW2d 667 (1998).[4] Consequently, the tribunal properly

---

[4] We note that in a previous appeal involving tax year 2002, this Court affirmed the MTT's determination that the practice facility's existing use was its highest and best use. *Detroit Lions, Inc v Dearborn*, unpublished opinion per curiam of the Court of Appeals, issued June 5, 2007 (Docket No. 266260), slip op at 3.

considered the practice facility's existing use in determining its usual selling price. See *id*.

Petitioners also assert that the practice facility is a "special purpose" property for which no active market exists, and that different standards should therefore govern its valuation. It is unclear whether the MTT found the overall practice facility to be unique in this case. Indeed, the tribunal explained that it "did not find any components that are unique to the owner other than the indoor practice field." We acknowledge that "[m]erely because property is put to an unusual use does not render it unique for purposes of property taxes." *Safran*, 88 Mich App at 383. At the same time, however, this Court has previously affirmed the MTT's determination that the practice facility is a "special-purpose" property. *Detroit Lions, Inc v Dearborn*, unpublished opinion per curiam of the Court of Appeals, issued June 5, 2007 (Docket No. 266260), slip op at 3. But irrespective of the tribunal's exact finding on this matter, we note that even if a parcel has a special purpose and limited market, its existing use may still constitute its highest and best use and provide the best evidence of its usual selling price. See *Great Lakes*, 227 Mich App at 408; *Clark Equip*, 113 Mich App at 785. We perceive no error with respect to this issue.

Nor do we agree with petitioners' contention that the MTT erred by relying on the practice facility's original build-to-suit cost, less depreciation, to determine the property's true cash value for tax years 2004 through 2009.

Petitioners argue that the practice facility's original cost, less depreciation, should not have been used to value the real property. However, experts on both sides agreed that some version of the cost approach should be used to determine the value of the buildings and im-

provements. The cost-less-depreciation approach is one of the traditional methods of calculating true cash value. *Meadowlanes*, 437 Mich at 484-485. "It is the duty of the Tax Tribunal to select the approach which provides the most accurate valuation under the circumstances of the individual case." *Antisdale v Galesburg*, 420 Mich 265, 277; 362 NW2d 632 (1984). It is well settled that the cost-less-depreciation method is particularly appropriate for valuing special-purpose properties with a limited or inadequate market. *Presque Isle Harbor Water Co v Presque Isle Twp*, 130 Mich App 182, 193 n 14; 344 NW2d 285 (1983); *Tatham v Birmingham*, 119 Mich App 583, 591; 326 NW2d 568 (1982); see also *Twenty-two Charlotte, Inc, v Detroit*, 294 Mich 275, 284-285; 293 NW 647 (1940).

Of course, under the traditional cost-less-depreciation method, the land is valued in its unimproved state and depreciation (including depreciation due to obsolescence) is then deducted from the *replacement or reproduction* cost of the buildings and improvements. See *Meadowlanes*, 437 Mich at 484 n 18. Here, in contrast, the MTT deducted depreciation from the *original* build-to-suit cost rather than the replacement or reproduction cost. "However, in and of itself, this does not render the [MTT's] cost approach invalid because 'variations of the [traditional] approaches and entirely new methods may be useful if found to be accurate and reasonably related to the fair market value of the subject property.'" *Wayne Co*, 261 Mich App at 209, quoting *Meadowlanes*, 437 Mich at 485. Indeed, this modified original-cost-less-depreciation approach has been used to value special-purpose properties. See *Wayne Co*, 261 Mich App at 210.

"[T]he determination of true cash value is not an exact science and . . . often involves a reconciliation of

various approaches." *Great Lakes*, 227 Mich App at 398. Moreover, it frequently "involves a considerable amount of judgment and reasonable approximation," and "there is no rule of law that requires the Tax Tribunal to quantify every possible factor affecting value." *Id.* at 398-399. It is within the expertise of the MTT to determine which method provides the most accurate valuation under the particular circumstances of the case. *Meadowlanes*, 437 Mich at 485. In the case at bar, the tribunal determined that a modified cost-less-depreciation approach, based on the original build-to-suit cost, provided the most accurate value of the practice facility. This determination did not constitute an error of law, and it was supported by substantial evidence. Const 1963, art 6, § 28.

As explained earlier, the MTT determined that the original build-to-suit cost of $33,000,000 was the best evidence of the true cash value of the buildings and improvements in 2004. With respect to the value of the land, the tribunal found that the $5,470,000 figure advanced by petitioners was "reasonable for the area and [will be] used to determine the value of the subject property." Adding these sums together, the tribunal determined that the total true cash value of the real property was $38,470,000 for tax year 2004. Taking into account the fluctuation in land values between 2005 and 2009, as well as the evidence concerning depreciation and obsolescence, the MTT set the following true cash values for the practice facility for the remaining years: $39,734,700 for tax year 2005, $39,772,200 for tax year 2006, $36,650,500 for tax year 2007, $34,020,000 for tax year 2008, and $31,510,000 for tax year 2009.[5] This Court may not

---

[5] Applying the aforementioned 82/18 split, the MTT then calculated the amount taxable by Dearborn and the amount taxable by Allen Park for tax years 2004 through 2009.

substitute its judgment for that of the MTT, even if we would have reached a different result than the tribunal. *Black v Dep't of Social Servs*, 195 Mich App 27, 30; 489 NW2d 493 (1992). The MTT's calculation of the practice facility's true cash value for tax years 2004 through 2009 was principled and reasoned. We affirm the tribunal's determinations concerning the true cash value of the real property, which were supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28.

V. DOCKET NO. 300830

Petitioners assert that the MTT erred by adopting respondents' proposed values, which were based on the STC multiplier tables. Petitioners also contend that the tribunal adopted a wrong principle and committed an error of law by valuing the personal property in gross by category rather than taking into account the market value of each individual asset. For the reasons that follow, we conclude that the tribunal committed an error of law with regard to the valuation of the personal property because it relied exclusively on respondents' proposed values and did not conduct an independent analysis of its own.

Like real property, tangible personal property must be taxed on the basis of its true cash value. Const 1963, art 9, § 3; see also *Wayne Co*, 261 Mich App at 178. "The petitioner has the burden of proof in establishing the true cash value of the property." MCL 205.737(3). The MTT must apply its expertise to the facts of the case and make an independent determination of true cash value. *Jones & Laughlin*, 193 Mich App at 353.

Petitioners' expert, J. Michael Clarkson, purported to determine the market value for each asset using Internet e-commence data. However, as explained previously,

the MTT concluded that the valuation evidence presented by Clarkson lacked credibility for numerous reasons. The tribunal also found that Clarkson's appraisal data were vague, inconsistent, and "fraught with errors." The tribunal noted that the data were based on sales and listings of dissimilar items, and found that Clarkson had wholly omitted approximately $1,200,000 in assets owned by WCF Land from his appraisal. In contrast, the MTT generally accepted the valuation evidence presented by Alphonso Consiglio. Consiglio had reconciled petitioners' personal property statements and had applied the STC multiplier tables to the original asset values. The tribunal noted that Consiglio had taken into account all items of personalty in his report, including those items that had been omitted by Clarkson.

We do not disturb the MTT's findings regarding the credibility of the witnesses. It is exclusively for the tribunal to assess the credibility of the witnesses who appeared before it. *Pontiac Country Club v Waterford Twp*, 299 Mich App 427, 436; 830 NW2d 785 (2013); *President Inn Props, LLC v Grand Rapids*, 291 Mich App 625, 636; 806 NW2d 342 (2011). We must defer to the tribunal's determinations of witness credibility. See *Huron Behavioral Health v Dep't of Community Health*, 293 Mich App 491, 497; 813 NW2d 763 (2011).

Nevertheless, we are compelled to reverse in this case because the MTT committed an error of law by failing to undertake an independent determination of true cash value. Upon finding that "[p]etitioners have not carried their burden of proving that the assessment is excessive," the tribunal simply adopted the personal property values advanced by respondents, at least with respect to those assets owned by the Detroit Lions. And with respect to those assets owned by WCF Land, it

appears that the tribunal merely adopted respondents' proposed values after making certain downward adjustments for items that had already been accounted for as part of the realty.

It is undisputed that the personal property values advanced by respondents were based on the STC multiplier tables. The STC multiplier tables are used by taking the property's historical or original cost by year of acquisition and applying a multiplier to convert the cost to current true cash value. *Wayne Co*, 261 Mich App at 181. But the STC multiplier tables are merely guides, and do not have the force of law. *Danse Corp v Madison Heights*, 466 Mich 175, 182; 644 NW2d 721 (2002); *Wayne Co*, 261 Mich App at 245. Respondents' proposed personal property values were incomplete because they were not developed after research and a review of the other traditional methods for determining true cash value. *Meadowlanes*, 437 Mich at 485-486.

The tribunal, itself, similarly failed to consider other traditional methods of valuation. Upon finding that petitioners had not carried their burden of proof, the MTT simply adopted the values proposed by respondents (with certain downward adjustments for the assets owned by WCF Land) without making its own, independent determination of true cash value. This constituted error. *Jones & Laughlin*, 193 Mich App at 355. The tribunal must at least consider the other traditional methods of determining true cash value, *Wayne Co*, 261 Mich App at 206, and "has the duty to determine the property's true cash value using the approach that most accurately reflects the value of the property," *Pontiac Country Club*, 299 Mich App at 435. Specifically, the tribunal must "consider multiple approaches to determine . . . true cash value, correlating, reconciling, and weighing the values derived under the

various approaches to reach a final estimate of the property's value." *Id.* There is simply no record evidence that the MTT ever considered any of the other approaches before setting the true cash value of the personal property. Because the tribunal did not consider the other approaches and reconcile the values derived thereunder, it is impossible to discern whether the STC multipliers provided an accurate calculation of the true cash value of the personal property in this case. Cf. *Lionel Trains, Inc v Chesterfield Twp*, 224 Mich App 350, 352; 568 NW2d 685 (1997).

We conclude that the tribunal "shirk[ed] its duties" by failing to make an independent determination of the true cash value of the personal property. *Pontiac Country Club*, 299 Mich App at 436. The tribunal was not entitled to merely adopt the values advanced by respondents, which were derived from the STC multiplier tables, without conducting its own analysis. We accordingly reverse the MTT's decision concerning the true cash value of the personal property and remand to the tribunal. On remand, the MTT shall make an independent determination of the true cash value of the personal property. *Jones & Laughlin*, 193 Mich App at 355-356.

In Docket No. 299414, we affirm in part and reverse in part. In Docket No. 300830, we reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction. No taxable costs pursuant to MCR 7.219, no party having prevailed in full.

BECKERING, P.J., and M. J. KELLY, J., concurred with JANSEN, J.