*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DETROIT DIESEL CORPORATION,

        Petitioner-Appellee,

v

REDFORD TOWNSHIP,

        Respondent-Appellant.

UNPUBLISHED
January 21, 2021

No. 350407
Tax Tribunal
LC No. 17-001174

Before: SWARTZLE, P.J., and RONAYNE KRAUSE and RICK, JJ.

PER CURIAM.

In this ad valorem property-tax appeal, respondent Redford Township appeals by right the decision of the Michigan Tax Tribunal valuing at $18,120,000 the three-million square-foot single-use manufacturing plant owned by petitioner, Detroit Diesel Corporation. At the hearing, the parties presented vastly different valuations, with the Township valuing the property's true-cash value at $50,000,000 based on a highest-and-best use of "single-user manufacturing," and petitioner valuing the property's true-cash value at $9,410,000 based on a highest-and-best use of general-industrial use.

The tribunal agreed with petitioner that the highest-and-best use of the plant was industrial use, which encompassed a variety of industrial uses including the present use, single-user manufacturing. The tribunal then based its valuation on the sales-comparison approach using the only comparable it found reliable: the sale of the former General Motors Powertrain plant for multi-tenant conversion. Although the Township raises several purported errors on appeal, we conclude that there is no basis for reversal, and, accordingly, we affirm.

## I. BACKGROUND

This tax appeal involves a valuation dispute for the 2017 tax year of petitioner's single-user manufacturing facility located primarily in Redford Township. Approximately 12 percent of the property is located within the taxing jurisdiction of the City of Detroit. Although the property tax relative to that portion of the property is not at issue in this appeal, the parties and the tribunal considered the entire property for purposes of valuation.

-1-

As of December 31, 2016, the date of valuation, petitioner used the property to manufacture powertrains, diesel engines, and axles for heavy and medium trucks. At valuation, petitioner's complex spanned approximately three million square feet; the first million square feet of the plant was constructed before World War II and the plant was then expanded piecemeal through multiple additions over time. Overall, as of valuation, the complex included administrative and office spaces, an engineering laboratory, manufacturing and storage spaces, educational and training classrooms, a fitness center, a daycare, and a cafeteria.

Despite the plant's age, petitioner was using it to conduct modern manufacturing activities. Petitioner had made improvements to the real estate, including raising the ceiling height and adding additional dock doors, as needed for its manufacturing activities. Notwithstanding these improvements, large portions of the facility were not up to modern standards, e.g., 40 percent of the facility had ceilings that were 16-feet or lower, some woodblock flooring remained, and approximately a million square feet of walls lacked dock doors. Further, the plant needed a substantial portion of its roof replaced. Taking the plant's condition together with its additions and improvements gave it an adjusted age of around 50 years old.

For the 2017 tax year, the Township determined the true-cash value of the property to be approximately $41 million, resulting in a taxable value of approximately $20 million. After protesting before the Township's Board of Review, petitioner filed a petition in the Tax Tribunal challenging the taxable value for the 2017 tax year. Petitioner alleged that the valuation was unlawful because it exceeded more than 50 percent of the property's true-cash value, and also that the assessment was discriminatory because it was higher than the true-cash value of the average assessment in the same district.

The matter proceeded through discovery. Eventually, the tribunal conducted a seven-day hearing.

## A. PETITIONER'S PROOFS

Petitioner introduced the testimony of Keith Vaughn, petitioner's technical-services manager. He testified about the physical attributes and condition of the building. Petitioner also introduced the testimony of an appraiser, Laurence Allen, who indicated that, as of the date of valuation, very few users were in the market for a three-million square-foot complex. Allen noted that while many automakers had shut down their plants in Michigan, a demand for these types of buildings from nonautomotive companies existed, especially for warehouses and distribution, but that a plant like the subject one would most likely be purchased for industrial redevelopment or conversion into a multi-tenant space. According to Allen, the highest-and-best use of the property, for purposes of conducting a sales-comparison approach to valuing the property, was "industrial development." Allen clarified that such a building could be used for a wide variety of industrial users and uses, including the current single-use manufacturing.

Ultimately, Allen used the sales-comparison approach to value the true-cash value, or fair-market value, of the property at $3.15 per square foot, or $9,410,000. To establish this value, Allen evaluated four comparable adjusted sales and seven additional unadjusted sales. Then, Allen selected a value that was within the mid-range of all of these sales, as well as within the mid-range

of the two adjusted sales he found to be most comparable to the subject property (Allen Sale 1 and Allen Sale 4).

To compute adjusted sales, Allen chose sales of manufacturing plants that had over one million square feet, were located in the Midwest, and had sold within the previous five years, adjusting the unit rate (price per square foot) to account for differences between the subject property and the comparables where applicable. The adjustments recognized differences in market conditions, size, location, average clear ceiling height, finished office areas, age, and condition.

The first comparable (Allen Sale 1) was the former GM powertrain plant, located in Livonia, Michigan, three miles from the subject property. It sold for $3,710,000 in November 2015. The plant, which was used to manufacture gas engines, was approximately one million square feet, was built piecemeal over the years, had some limited ceiling heights, and was purchased for conversion to multi-tenant use. Adjustments were applied for market conditions, the plant's size, the percentage of finished space, functional utility, and the cost of replacing the roof, resulting in an adjusted price of $6.71 per square foot. Also, Allen gave Allen Sale 1 more weight in valuing the subject property because of its close proximity to the property.

Allen's second comparable (Allen Sale 2) was the Delphi plant, a 1.5-million-square-foot complex located in Flint, Michigan. It sold in May 2013 for $3.8 million or $2.51 per square foot. It was comparable in age to the subject property, had similar ceiling heights, and was also purchased for multi-tenant use; after the sale, the purchaser tore down approximately 900,000 square feet of the building before converting the remainder for individual tenants. Allen applied adjustments for market conditions and the plant's inferior location, as well as for portions of the plant that had deteriorated, size, functional utility, and percentage of finished space, resulting in an adjusted price of $3.29 per square foot.

The third comparable (Allen Sale 3), a 1.2 million square-foot Ford plant located in Sandusky, Ohio, sold in July 2012. The plant was built in 1956 and had better ceiling heights than the subject property; the purchaser made no changes to the complex, as it had purchased the property to continue the manufacture of automotive parts. To entice the sale, the seller had entered into a contract for the production of the parts with the buyer. Adjustments were applied for market conditions, the plant's inferior location, size, the percentage of finished space, and functional utility, resulting in an adjusted price of $3.84 per square foot.

The fourth comparable (Allen Sale 4), a 3.4 million square-foot GM plant located in Pontiac, Michigan, sold for $1.28 per square foot in September 2011. Allen testified that the plant was a newer plant, built in the 1970s. It had more uniform ceiling heights and larger truck bays, which were used to manufacture trucks, and was sold during GM's bankruptcy. After purchase, because more money could be made by developing the land, the purchaser tore down the plant and built a new 400,000 square foot manufacturing building. Allen applied adjustments for market conditions, size, functional utility, and percentage of finished space, resulting in an adjusted price of $1.80 per square foot. Allen testified that he gave Allen Sale 4 more weight in valuing the subject property because of its similarly in size.

Allen testified that he considered seven supplemental unadjusted sales. All of these supplemental sales were of single-user manufacturing buildings. They averaged around 3.2

million square feet, were situated throughout the United States, and were purchased primarily for multi-tenant use.

## B.  RESPONDENT'S PROOFS

John Widmer, the Township's appraiser, provided a conflicting account of the market and the property itself, as well as the value of the property.  According to Widmer, the geographic area in which the plant was located was strong.  He testified that, in the previous several years, high demand existed for industrial space, driven by the auto industry, as well as ecommerce and tech companies; rents for industrial spaces were rising, vacancies were low, and construction of industrial facilities had added 5.8 million square feet of new industrial space in 2017 alone. Widmer testified that the subject property was a "functioning modern industrial property," which had the physical attributes and utility to support modern manufacturing activities.  Widmer noted the presence of modern assembly lines, updated lighting, air conditioning, and average to high-end finishes in the office spaces; he denied observing any woodblock floors and further indicated that the interior walls could be easily moved.

Widmer also used the sales-comparison approach to arrive at a value of $50,000,000. Unlike Allen, however, Widmer concluded, based on renovations that had made the property a modern and efficient manufacturing facility, that the highest-and-best use of the property was continuation of single-user manufacturing.  Conversion of the property, in Widmer's view, was not feasible considering the utility of the present plant.  Widmer also used four comparable sales, adjusting them for differences in certain characteristics as compared to the subject property, as well as numerous unadjusted supplemental sales, giving most weight to a single sale (Widmer Sale 2) that he considered most like the subject property.  Notably, none of Widmer's sales were the same as Allen's sales.  This was appropriate, according to Widmer, because the properties that Allen relied on were converted to multi-tenant use after sale and, thus, were not truly comparable to the property at issue, the highest-and-best use of which was continued single-user manufacturing.

Widmer Sale 1 was a 532,489-square-foot industrial building purchased by a long-term tenant in June 2014 for $11,400,000, or $21.41 per square foot.  The building was constructed in 1978, was later expanded in 1989, and had ceilings ranging between 24 and 28 feet.  Even though the sale was between a lessor and the lessee, Widmer considered the sale to be at market because an appraisal was obtained.  After adjustments for, *inter alia*, market conditions, location, physical characteristics (including size), age, and industrial utility, Widmer assigned it an adjusted sale price of $18.00 per square foot.

Widmer Sale 2 was a 1,249,073-square-foot multi-tenant industrial building sold in a lease-fee transfer in September 2015 for $23,250,000 or $18.61 per square foot.  The building was originally constructed in 1956 for single-user manufacturing and had ceiling heights ranging from 19 to 44 feet.  At the time of the sale, the building was partially leased.  After adjustments for market conditions, age, condition, and industrial utility, Widmer arrived at an adjusted sale price of $17.00 per square foot.

Widmer Sale 3 was a 449,623 square-foot multi-tenant industrial building sold in a leased-fee transaction in December 2015 for $6,155,000 or $13.69 per square foot.  Originally built in

1968 for single-use manufacturing, the building, which had an average ceiling height of 24 feet, was partially occupied at the time of sale. After certain adjustments for, *inter alia*, market conditions, location, and building characteristics (including size), Widmer assigned it an adjusted value of $15.89 per square foot.

Widmer's final adjusted sale (Widmer Sale 4), was a 526,540 square foot multi-use building. At the time of sale in August 2012 it had been vacant. Consequently, the building, constructed in 1957 with 20 to 26-foot ceilings, had deferred maintenance and needed a new roof. Before the 2012 sale, it had been acquired through a foreclosure, but was sold in 2012 for $9,000,000, or $18.04 per square foot. After certain adjustments, Widmer arrived at an adjusted sales price of $17.49 per square foot.

Widmer also considered four additional unadjusted sales. Two of the sales were sales to tenants and another was a sale-lease-back transaction. While the average square footage of these comparables was closer to the subject property—1.3 million square feet—two of the comparables were purchased for multi-tenant uses.

## C. TRIBUNAL'S RULING

At the close of the evidence, petitioner argued that the Township's highest-and-best-use conclusion—that the property would be most highly valued if purchased for single-use manufacturing—was not supported by Widmer's comparables, because the vast majority of them were not sales for single-user manufacturing use. Petitioner further argued that all of Widmer's sales were inherently suspect because his comparables were smaller than the subject property. The Township countered that Allen's conclusion that the highest-and-best use was generic industrial lacked credibility because Allen "only present[ed] information regarding the automotive industry" and failed to address manufacturing, warehousing, distribution, and research and development.

After the hearing, the tribunal issued a thorough, comprehensive opinion and judgment. The tribunal, after summarizing the appraisers' testimonies at length, found that the sales-comparison, or market approach, would be most useful in providing the most accurate valuation. To this end, the tribunal recognized that the key to assessing a property's fair-market value is evaluating a property's highest and best use, because that use will influence the price a buyer will pay on the open market.

Turning to the appraisers' testimonies, the tribunal noted that it was generally "unsatisfied and unpersuaded" by the appraisers' sales comparables with regard to valuing the property and that, while both appraisers were experts and had used the same valuation approach, they had reached vastly different conclusions—a difference of $40 million—and had not a single comparable in common. Then, taking a global view of the testimony, the tribunal found that multi-tenant use is the most frequent use for large manufacturing facilities, given that 9 of 11 of Allen's sales were converted to multi-tenant use after the sale and that 5 of 8 of Widmer's sales were already multi-tenant at the time of sale. Noting that the subject property is a three-million square-foot single-user manufacturing building—not a 500,000 square foot building with multiple tenants—the tribunal found that sales of multi-tenant industrial buildings were not useful given that they did not represent the subject property and costs to convert the building would be substantial. Ultimately, the tribunal found that the highest-and-best use of the property, which

would result in its highest value, was "industrial use," not solely single-use manufacturing as the Township had advocated.

Next, the tribunal methodically assessed the utility of each sales comparable, finding as follows:

Allen Sale 2:     The tribunal gave this sale "little reliance," given conflicting testimony whether the property was sold for scrap or renovation.

Allen Sale 3:     The tribunal found this sale "less relevant," given that the sale occurred in Ohio and no adjustments were made to account for the out-of-state sale.

Allen Sale 4:     The tribunal found this was "not the best comparable," as it was sold and demolished.

Allen's additional unadjusted comparables:

The tribunal found that these additional comparables should be given "little emphasis," as they were from out of state or were sold for demolition.

Widmer Sale 1:     The tribunal was "not persuaded" given the "small size [532,489 square feet] relative" to the subject property and unknown conditions of the sale.

Widmer Sale 2:     The tribunal found that this sale was "not comparable to the subject" property since it was a multi-tenant building that was 100 percent leased at the time of sale.

Widmer Sale 3:     The tribunal was "not persuaded" by this sale because the building was only 449,623 square feet and was already converted to multi-tenant use at the time of sale.

Widmer Sale 4:     The tribunal placed "little emphasis" on this sale because the building was 526,540 square feet and no testimony was provided regarding the effect of a prior foreclosure on the property.

Widmer's additional unadjusted comparables:

The tribunal "place[d] no emphasis" on these sales because they were all sale-leasebacks with no indication that they were sold at market rates.

The tribunal then stated:

After placing little emphasis on Mr. Allen's sales two, three and four, and additional comparables, as well as Mr. Widmer's adjusted and supplemental sales comparables, the Tribunal is left with Mr. Allen's sales comparable one. The sale was of the former General Motors Powertrain plant. It is located just less than two miles from the subject property and manufacturing engines, such as the subject. There is a DTE substation at the subject property, as well as at the comparable. Respondent contends that the sale was from RACER trust and as such, was for a low price as RACER's mission is to clean up and sell properties. However, the sale from RACER was to Schostak, and the sale utilized by Mr. Allen was from Schostak to Ashley Capital. In fact, he testified that the RACER environmental monitoring remained with the property after sale, which is an asset. Mr. Vaughn testified he pays $30,000 per year for environmental monitoring at the subject property, which was not supplied to the subject by the RACER trust, as General Motors was relieved of this obligation at the time of its bankruptcy. Mr. Allen testified comparable one has hydrocarbon plumes, similar to those located at the subject property. The comparable does have deferred maintenance as half of the roof required replacement, so Mr. Allen adjusted the purchase price up to $6.04 cents per square foot which was similar to Mr. Widmer's adjustment for roof replacement with regard to his comparable four, obtained from Marshall Valuation Service. The comparable did have a lease in place at the time of sale, but it was a short-term lease and it was understood that the tenant was leaving, unlike in Mr. Widmer's true, leased-fee sales.

As far as the other adjustments to the comparable, the Tribunal is simply not persuaded by them, especially the size adjustment. As such, it finds the best method of valuing the property is to use its sale price per square foot with only the commonly confirmed deferred maintenance adjustment for roof repair. As such, the Tribunal finds the true cash value of the subject property for the 2017 tax year to be 3,000,000 square feet (rounded) multiplied by $6.04 per square foot or $18,120,000. This amount is allocated between the parcels and the true cash value of the parcel located in Redford Township, which is the subject of this appeal, is $15,873,120, or $15,900,000, rounded.

The Tribunal finds, based upon the Findings of Fact and the Conclusions of Law set forth herein, that the subject property is over assessed.

The Township now appeals by right.

## II. ANALYSIS

### A. STANDARD OF REVIEW

"This Court's ability to review decisions of the Tax Tribunal is very limited." *President Inn Props LLC v Grand Rapids*, 291 Mich App 625, 630; 806 NW2d 342 (2011). In the absence of fraud, the Court's review is limited to determining whether the tribunal made an error of law or adopted a wrong legal principle. Const 1963, art 6, § 28. "The tribunal's factual findings are

upheld unless they are not supported by competent, material, and substantial evidence." *Menard, Inc v Escanaba*, 315 Mich App 512, 520; 891 NW2d 1 (2016) (cleaned up).

## B. HIGHEST-AND-BEST USE

Respondent first argues that the tribunal erred in its finding that "industrial use," encompassing both single-use and multi-use, was the highest-and-best use of the property. Respondent argues that no evidence in the record supported the tribunal's conclusion with regard to legality, financial feasibility, and maximum productivity. We conclude that the tribunal's highest-and-best use determination was not legally erroneous, and was supported by substantial, competent, and material evidence on the record.

" '[T]rue cash value' is the starting point for determining the taxable value of real and tangible personal property in Michigan." *Detroit Lions, Inc v Dearborn*, 302 Mich App 676, 696; 840 NW2d 168 (2013). Generally, real property is taxed at 50 percent of its true cash value. MCL 211.27a. "True cash value is synonymous with fair market value." *Great Lakes Div of Nat'l Steel Corp v Ecorse*, 227 Mich App 379, 389; 576 NW2d 667 (1998). The term "means the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price that could be obtained for the property at private sale, and not at auction sale . . . or at forced sale." MCL 211.27(1).

While the petitioner has the burden of establishing the true cash value of the property, "the Tax Tribunal has a duty to make an independent determination of true cash value." *President Inn Props LLC*, 291 Mich App at 631. In particular, the "Tax Tribunal is under a duty to apply its expertise to the facts of a case in order to determine the appropriate method of arriving at the true cash value of property, utilizing an approach that provides the most accurate valuation under the circumstances." *Menard, Inc*, 315 Mich App at 521-522 (cleaned up). "The three most common approaches for determining true cash value are the capitalization-of-income approach, the sales-comparison or market approach, and the cost-less-depreciation approach." *Great Lakes Div of Nat'l Steel Corp*, 227 Mich App at 390. The "final value determination must represent the usual price for which the subject property would sell irrespective of the specific method employed." *Menard, Inc*, 315 Mich App at 523 (cleaned up).

Regardless of the methodology used, the property must be assessed at its highest-and-best use, which is a concept fundamental to determining true-cash value. *Id*. at 522. "Highest and best use means the most profitable and advantageous use the owner may make of the property even if the property is presently used for a different purpose or is vacant, so long as there is a market demand for such use." *Detroit Lions, Inc*, 302 Mich App at 697 (cleaned up). The concept is significant to determining true-cash value because it "recognizes that the use to which a prospective buyer would put the property will influence the price that the buyer would be willing to pay for it." *Menard, Inc*, 315 Mich App at 522. "A highest-and-best-use determination requires simply that the use be legally permissible, financially feasible, maximally productive, and physically possible." *Detroit Lions, Inc*, 302 Mich App at 697 (cleaned up).

Here, the tribunal found that the property's highest-and-best use was "industrial use." The tribunal reasoned:

Mr. Allen's determination of the highest and best use of the property is for industrial use, which encompasses single-user manufacturing, as well as warehouse/distribution. He testified, "I found that most of the larger plants over a million square feet are sold for redevelopment as multi-tenant industrial plants, so they end up getting used by multiple users." Mr. Widmer's determination of the highest and best use of the subject property is continued, single-user, manufacturing. This conclusion is made because "the subject is in very good condition. Likewise, with the renovations completed over the past several years, it is considered to represent a modern and efficient manufacturing facility, that does not need to be converted or renovated."

Based on its analysis below for the 2017 tax year, the Tribunal finds Mr. Allen is correct, the highest and best use of the subject property, or the use that results in the highest value, is for industrial use, not for single-user manufacturing.

## 1. LEGAL PRINCIPLE

On appeal, aside from claiming that the tribunal's finding was not supported by substantial evidence, the Township also argues that the tribunal's understanding of the highest-and-best-use concept was legally erroneous and contrary to Michigan law. Thus, the Township argues that the tribunal applied an incorrect legal principle.

In this regard, the Township first argues that the tribunal's highest-and-best-use finding is "suspect" because general-industrial use encompasses single-user manufacturing, but the tribunal rejected continued single-user manufacturing as the highest-and-best use. In other words, the Township posits that an inherent inconsistency exists in the adoption of "industrial use" as the highest-and-best use because the tribunal rejected single-user manufacturing as the highest-and-best use. The Township's interpretation of the tribunal's opinion is misplaced. When the tribunal's finding is read in context, it is clear that while single-user manufacturing was rejected as the *one and only* highest-and-best use, the tribunal, by agreeing with Allen's testimony, found that general-industrial use was the highest-and-best use, which by definition encompasses single-user manufacturing.

Relatedly, the Township posits that by not specifying *the* highest-and-best use, the tribunal effectively found that every industrial use would produce the same sales price—a "nonsensical" conclusion not supported in the record. The Township, however, cites no legal authority in support of its assertion that the highest-and-best-use analysis must arrive at a singular specific use to be valid. In fact, this Court's jurisprudence indicates otherwise; on at least one occasion, this Court has upheld general-industrial use as the highest and best use, as opposed to a current limited single-manufacturing use. In *Teledyne Continental Motors v Muskegon Twp*, 163 Mich App 188; 413 NW2d 700 (1987), which also involved a property-tax assessment of an industrial plant, the Court upheld general-industrial use as the highest-and-best use, as opposed to the current single use, single-user manufacturing. This Court addressed the claim that a single use was more appropriate, stating,

-9-

Respondent first claims that the Tax Tribunal erred in concluding that the highest and best use of the property was for general industrial uses, rather than its current limited use.

\* \* \*

In the instant case, the Tax Tribunal considered the existing use of the industrial plant and believed that manufacturing operations would continue for a considerable length of time. However, the Tax Tribunal also noted that the industrial plant was old and obsolete, and recited the following examples of functional deficiencies from the record:

1. Inadequate roof loads.
2. Overtaxed water and sewer services.
3. Unreliable electrical power distribution.
4. Inadequate wooden flooring.
5. Heating and sprinkling systems needing replacement.
6. Inadequate building ventilation.
7. Limited floor loads.

Petitioner submitted evidence showing that comparable plants throughout the midwest had been sold for general industrial purposes. Respondent failed to present any evidence on how the existing use of the industrial plant would affect its usual selling price under a market approach to valuation. The Tax Tribunal did not adopt a wrong principle or commit legal error in valuing the property as if a potential buyer would purchase it for general industrial purposes. [*Id*. at 192-193.]

Moreover, the focus of the highest-and-best-use concept is the identification of the most profitable use of the property going forward so long as there is a market demand for that use. *Detroit Lions, Inc*, 302 Mich App at 697. This does not necessarily mean that the identified use will always produce the same sales price in every circumstance. Indeed, the Township, by maintaining that the highest-and-best use must meet both of these qualifications, makes claims contrary to Michigan law and cites no authority in support.

Accordingly, the Township has failed to establish that the tribunal adopted an incorrect legal principle in conducting its best-and-highest-use analysis.

2. SUBSTANTIAL EVIDENCE

This conclusion does not end the analysis, however, because the Township also argues that the tribunal's highest-and-best-use determination is not supported by substantial evidence. The Township first argues that no evidence supported the conclusion that multi-tenant use was legally permissible. The Township points out that the relevant zoning ordinances were not admitted into evidence and that Allen merely testified that nothing in his appraisal showed that multi-tenant use was not legally permissible. We find the Township's argument unpersuasive.

Even assuming that Allen did not affirmatively state that multi-tenant use was legally permissible, this point is immaterial because other evidence sufficiently supports the conclusion

that multi-tenant use would be legally permissible. Specifically, Widmer testified that the property was zoned industrial, "the most intensive industrial zoning, so there really are limited restrictions in terms of what type of use can be applied within that site." He further indicated that in its current use, the complex represented all phases of industrial uses, including research and development, light and heavy manufacturing, warehousing, and distribution. Moreover, it is undisputed that portions of the complex had been leased—one lease being for a surface lot for vehicle storage and the other lease being to a subsidiary for both office space and research-and-development space. The record, therefore, sufficiently supports the conclusion that multiple industrial uses and tenants would be legally permissible on the property.

Next, the Township maintains that no evidence existed to support the conclusion that multi-tenant use was financially feasible. The Township explains that Allen merely testified that conversion costs would be "substantial," that he did not account for these costs in his appraisal, and that without discussion of specific conversion costs for the "infinite combinations" of potential conversions, there is no substantial evidence on the record to support a conclusion that conversion is financially feasible. The Township's assertions are misplaced.

Mainly, the Township wrongly assumes that a robust discussion of conversion costs and a cost analysis of the infinite conversion possibilities was necessary to show that conversion was financially feasible. While conversion costs could be relevant to evaluating financial feasibility, such analysis was not imperative for petitioner to meet its burden of proof in this case. This is because petitioner showed that conversion was financially feasible through Allen's comparable sales analysis. Indeed, the Township ignores the fact that petitioner adduced evidence that multiple similar properties, meaning older, partially updated 1,000,000 square-feet-plus mostly single-user manufacturing facilities, had sold for purposes of conversion to multi-tenant industrial use. These sales reflect that such a use was not only desirable but financially feasible from a buyer's perspective. Indeed, the tribunal's best-use analysis recognized that most of the purchases were for conversion to multi-tenant after sale. Petitioner's comparable sales alone, then, provide sufficient, competent, and material evidence supporting the conclusion that conversion was financially feasible. Because petitioner met its burden, the burden shifted to the Township to rebut petitioner's evidence that conversion was not financially feasible, but it failed to put forth any evidence that conversion would be cost-prohibitive or otherwise unfeasible.

The Township further asserts that petitioner should have produced the very evidence—conversion costs—that the Township could have used to rebut petitioner's evidence. That petitioner did not produce detailed evidence of conversion costs is not surprising, given that it was unnecessary for it to prove its case, but also because it was not a relevant adjustment to calculating the property's fair market value. The comparable the tribunal placed most emphasis on was Allen Sale 1, which reflected a market price *before* conversion to multi-tenant use. The subject property also has not been converted to multi-tenant use. Under appraisal theory, it makes the most sense to use sales of large, mostly single-user manufacturing plants that are purchased for the purpose of converting to multi-tenant use, i.e., *before* conversion.

Finally, the Township argues that the tribunal erred by rejecting single-user manufacturing as the highest-and-best use because its alleged reasons for doing so—lack of sufficient ceiling height and insufficient number of dock doors—were not supported by the record. The tribunal did not, however, rely primarily on the lack of the subject property's modern amenities to reject single-

user manufacturing as the sole highest-and-best use. Rather, its discussion of the property's lack of modern attributes was referenced to support the tribunal's conclusion that "it was not appropriate to utilize sales comparables that were already multi-tenant at the time of sale," given that those facilities had more dock doors and greater ceiling heights. Moreover, evidence existed on the record that the property was not sufficiently up to modern standards: Vaughn testified that 40 percent of the property had ceiling heights of 16 feet or lower, not the 28 feet considered modern for manufacturing standards, and the property only had 47 dock doors, as opposed to the 200 dock doors that would be in accord with modern standards. Finally, the tribunal also relied on the lack of evidence that any entity was actually in the market for a three-million square-foot facility for the purpose of single-user manufacturing.

In sum, material, competent, and substantial evidence supported the tribunal's finding that the highest-and-best use of the property was general industrial use. In particular, the experts' adjusted and unadjusted comparable sales supported the conclusion that the most profitable and advantageous use of an almost 3,000,000 square foot single-user industrial plant, if put up for sale on the open market on December 30, 2016, was general industrial use, the most frequent use being conversion to multi-tenant use given market demands for smaller industrial space. While the Township contends that such a conclusion is without adequate support on the record, it fails to address the fact that most of the experts' comparable sales were for conversion to multi-tenant use or were already multi-tenant at the time of sale. Of the few sales of single-user-manufacturing facilities for single-use after sale, the transactions involved incentives (a contract for manufacture of parts) or a tenant entering into a lease buy back. In fact, the Township failed to adduce the most relevant evidence to support a conclusion that single-user manufacturing was the highest-and-best use: actual sales of million-square-foot-plus, single-use manufacturing properties that were used for single-user manufacturing *after* the sale. The fact that the Township's appraiser failed to uncover such sales in his research strongly suggests that single-user manufacturing is not the highest-and-best use of a plant like the one at issue. Accordingly, the tribunal's highest-and-best-use conclusion did not apply an incorrect principle and it was supported by substantial evidence on the whole record.

## C. VALUATION

The Township next argues that the tribunal's valuation was erroneous because it was not supported by competent, substantial, and material evidence on the record. We find respondent's argument unconvincing.

First, the Township argues that the tribunal should have disregarded Allen Sale 1 because it was a leased-fee transaction and the tribunal had disregarded other leased-fee transactions as indicative of fair-market value. The Township maintains that there was no evidence to support a conclusion that the lease was short-term, claiming that the evidence simply established that a lease was in place at the time of sale and the buyer would have an active income stream from the tenant. The Township is incorrect that no evidence supported a conclusion that the lease was short-term.

Allen testified that the tenant left the property shortly after the sale and that the purchaser bought the property for purposes of redeveloping the plant into a multi-tenant facility, not for purposes of collecting existing rents as an income stream. The fact that the lease was not admitted into evidence or that Allen did not testify as to the terms of the lease affects the weight and

credibility of his testimony. That the tribunal chose to believe Allen's testimony that Allen Sale 1 was not in fact a leased-sale transaction, that the plant was purchased for redevelopment, and that the tenant left shortly after the sale, are all determinations that this Court cannot weigh anew on appeal. *Great Lakes Div of Nat'l Steel Corp*, 227 Mich App at 404 ("The weight to be accorded to the evidence is within the Tax Tribunal's discretion.").

Next, the Township argues that the tribunal erred by relying on Allen Sale 1 when it found that none of the comparables were truly comparable to the subject property because of substantial size differences. The Township asserts that using a dissimilar comparable is not a valid valuation method. We conclude that the Township misconstrues the tribunal's opinion.

As the Township points out, the tribunal did state, "Mr. Allen adjusts three of his comparables by (50%) to (60%) for size, which suggests the comparables are not truly comparable to the subject." When read in isolation and in a perfunctory manner, this statement could be construed to mean that Allen's comparables (including Allen Sale 1) were not comparable due to substantial size differences. Read more closely, however, the tribunal did not expressly find that Allen Sale 1 lacked similarity due to its size; it merely found a *suggestion* of dissimilarity as to Allen Sale 1 based on the magnitude of the size adjustment. Moreover, the statement followed the tribunal's criticisms of Allen's substantial size adjustments; mainly, the tribunal found the size adjustments unreliable because the adjustment data relied on plants all below 1,000,000 square feet. Ultimately, the tribunal, in relying on Allen Sale 1, did not apply the size adjustment because it found the adjustment itself unpersuasive. The statement, when read in context of the entire opinion, then, does not reflect a finding that Allen Sale 1 lacked similarity to the subject property due to size; rather, it reflects the tribunal's criticism of the adjustment as unreliable, the application of which would actually make the comparables less similar to the subject. Contrary to the Townships' claim, then, the tribunal did not use a comparable that it had previously found to be unlike the subject property.

Finally, the Township asserts that the tribunal erred by failing to adjust Allen Sale 1 for additional deferred maintenance. The Township explains that the evidence showed that the buyer had additional expenditures for deferred maintenance beyond the roof and, absent consideration of these expenditures, the tribunal's decision was not supported by substantial evidence. The Township's argument is unpersuasive.

In its decision, the tribunal relied on Allen Sale 1 as the most comparable property with respect to a sale for purposes of valuation, but only accepted the adjustment for the roof, which it deemed deferred maintenance. The tribunal did not reference any other items of deferred maintenance, implicitly rejecting the additional expenditures that the Township now claims should have been accounted for. In particular, during Allen's cross-examination, the Township introduced marketing material from the buyer's website, which stated, "Upon acquisition, [the buyer] began a renovation program to address the deferred maintenance. The scope of work included roof replacement, additional dock doors and upgraded the lighting to T5 fluorescent, structural and paving repairs, and a new ESF fire suppression system for most of the building." Allen acknowledged these expenditures in his testimony and appraisal, but did not consider them deferred maintenance; rather, he viewed them as improvements related to conversion to multi-tenant use.

While the tribunal's duty is to determine the most accurate valuation under the circumstances, this Court has long recognized that "the determination of true cash value is not an exact science" and that the "process of weighing evidence involves a considerable amount of judgment and reasonable approximation." *Id.* at 398. This examination contemplates analysis and weighing of values provided by both parties with the goal of reaching a "well-supported conclusion that reflects the study of all factors that influence the market value of the subject property." *Meadowlanes Ltd Dividend Housing Ass'n v Holland*, 437 Mich 473, 486; 473 NW2d 636 (1991). There is no rule of law, however, "that requires the Tax Tribunal to quantify every possible factor affecting value." *Great Lakes Div. of Nat'l Steel Corp*, 227 Mich App at 399.

Here, the tribunal clearly found none of the parties' proposed comparable sales to be completely on point, and it found valuation of the property challenging. Nonetheless, the tribunal's opinion reflects that it extensively considered the parties' evidence, analyses, comparable sales, adjustments, and conclusions, and determined whether they were reasonable. While the tribunal did not include additional adjustments for "deferred maintenance" with respect to Allen Sale 1, its decision not to do so reasonably reflects that it agreed with Allen that these items were not truly deferred maintenance. This Court will not weigh the evidence anew or disturb such credibility determinations on appeal. *Id.* at 404. In any case, it was not incumbent on the tribunal to quantify every possible factor affecting the property's value. *Id.* at 399. Overall, the tribunal's decision is supported by substantial, competent, and material evidence on the whole record.

Affirmed.


/s/ Brock A. Swartzle
/s/ Amy Ronayne Krause
/s/ Michelle M. Rick